Stanley H. FRIED, Jr., and Richard
Strasser, Appellees,

v.

The NORTH RIVER INSURANCE
COMPANY, Appellant.

No. 82–1925.

United States Court of Appeals,
Fourth Circuit.

Argued March 7, 1983.

Decided June 27, 1983.

Walter E. Brock, Jr., Raleigh, N.C. (Young, Moore, Henderson & Alvis, Raleigh, N.C., on brief), for appellant.

Robin Vinson, Raleigh, N.C. (Samuel G. Thompson, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, N.C., Jerome M. Libenson, Baskins & Sears, Pittsburgh, Pa., on brief), for appellees.

Before RUSSELL and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

Appellees Fried and Strasser filed this suit against The North River Insurance Company (North River) alleging that a policy issued by North River afforded coverage for personal injuries they had sustained. North River contended that the policy it had issued was an excess coverage policy and that the amount of the judgments against its insured was insufficient to invoke North River's duty to pay under the policy. A magistrate found that the injuries were compensable under the policy and granted summary judgment to Fried and Strasser, which North River now appeals. Because we find from a plain reading of the policy that it did not afford coverage for the claims of Fried and Strasser, we reverse.

I

This is a diversity case with origins in a tragic car crash that occurred in Raleigh, North Carolina in 1977. Fried, Strasser, and several others were passengers in an automobile driven by their friend and fellow Duke University student, Valfrid J. Palmer (Val). Val failed to negotiate a curve on the highway and crashed into a tree; Val was killed, and the passengers sustained injuries. In a subsequent civil action in negligence, Fried and Strasser and another passenger, Cohen, obtained judgments against Val's estate.[1] These judgments have been only partially satisfied,[2] and Val's estate is unable to pay the remainder.

The car Val was driving at the time of the crash was owned by his brother, Glenn E. Palmer. Primary insurance was afforded to val as an additional insured under an Allstate policy issued to his brother Glenn. This policy, which extended liability coverage of $15,000 per person/$30,000 per occurrence, was the source of the partial satisfaction of the judgments and has now been exhausted.

The controversy in this case concerns an additional policy issued by North River to Valfrid J. Palmer (Mr. Palmer), father of Val and Glenn. This policy, bearing the title "Personal Comprehensive Catastrophe Liability Policy" was obtained by Mr. Palmer to insure him against catastrophic liability up to $1 million. Val qualified as an "insured" under the terms of this umbrella policy, and Fried and Strasser, as judgment creditors of Val's estate, seek to have the

---

1. Val's estate is the sole judgment debtor in this case. The district court in the initial negligence trial found that the North Carolina family purpose doctrine was inapplicable to this case and thus Val's parents were not liable for any damages.

2. The judgments obtained and the amounts already paid are as follows:

|  | Judgment | Amounts Paid |
|---|---|---|
| Strasser | $35,000 | $13,125 |
| Fried | 30,000 | 11,250 |
| Cohen | 15,000 | 5,625 |
|  | $80,000 | $30,000 |

Cohen is not a party to this litigation.

balance of their judgments satisfied from proceeds paid under the umbrella policy.

Fried and Strasser notified North River of their claim against the policy, but the insurer refused to accept liability for payment of the outstanding judgments. North River claimed that its liability under the policy was triggered only when the judgments against the insured exceeded $115,000 per person/$330,000 per occurrence, far above what the initial judgments were in this case. Fried and Strasser then filed this declaratory judgment action in federal district court in North Carolina to have their rights under the policy adjudicated.

The parties consented to a magistrate's jurisdiction and further agreed that the undisputed facts of the case made the issue of coverage under the policy ripe for summary judgment. The magistrate, applying North Carolina substantive law, found that the critical language in the policy concerning coverage was ambiguous and thus construed it against the insurer. The effect of this construction was to find that the policy did provide coverage to Val for the unsatisfied judgments, and North River was ordered to make the judgment creditors whole.

## II

■ In this diversity case we apply the law of the North Carolina forum, including its choice-of-law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The longstanding rule in North Carolina is that questions of contract construction and interpretation are determined by the law of the state where the contract was made, *Tanglewood Land Co. v. Byrd,* 299 N.C. 260, 261 S.E.2d 655 (1980), and this rule is applicable to contracts of insurance, *Roomy v. Allstate Insurance Co.,* 256 N.C. 318, 123 S.E.2d 817 (1962).

■ The policy here in issue was purchased by the insured in New York from a New York insurance agency.[3] Because we assume that on these facts the North Carolina courts would apply New York law in construing this contract, we apply it.

## III

### A

The problem is that of interpreting the coverage provisions of an umbrella or catastrophic liability insurance policy. Though the dispositive language of the policy is not the plainest, we conclude that it is plain enough to yield interpretation as a matter of law on cross-motions for summary judgment. The critical language defined coverage as being only for the "ultimate net loss" in excess of the "insured's retained limit." The ultimate net loss is the total amount of judgments against the insured, here $80,000, and there is no dispute that Val is an "insured."

The critical interpretive question concerns the meaning of "retained limit." That term is defined in the policy as "the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other underlying insurance available to the insured." Schedule A[4] listed several specific policies

---

**3.** The insurer, North River, is a New Jersey corporation with its principal place of business there. The contract of insurance, however, was sold by an insurance agency located in New York, and the contract apparently was executed and became final in New York.

**4.** Schedule A contained these policies

Schedule A – Schedule of Underlying Policies

| Carrier, Policy Number & Period | Type of Policy | Applicable Limits |
| --- | --- | --- |
| a) PENN GENERAL AMERICAN MOTOR | Comprehensive Personal Liability | Bodily Injury Liability or Property Damage Liability or both combined $100,000 each occurrence |

that had been issued to Mr. Palmer; these policies, which *did not* insure Val, had applicable limits in an automobile liability situation of $100,000 per person/$300,000 per occurrence for personal injury and $10,000 for property damages. There was "other underlying insurance available to the insured," in that the Allstate policy issued in Glenn Palmer's name extended coverage to Val in the amounts of $15,000/$30,000.

Under the umbrella policy, Val's "retained limit" is thus the sum of the "total applicable limits" of the Schedule A policies plus the amounts already paid under the Allstate policy of Glenn. The single issue therefore is what constitutes the "total applicable limits" of the Schedule A policies when those policies extended no actual coverage to the insured, Val.

Plaintiffs argue that, in this situation, "applicable limits" means the total amount of coverage *actually* provided by the Schedule A policies; under this interpretation, the insurer's duty to pay arises when Val exhausts the "other ... insurance available" from the Allstate policy of brother Glenn. On the other hand, North River argues that the applicable limits are the face values of the listed Schedule A policies regardless of whether those policies actually extended coverage to Val. Under North River's view, its duty to pay arises only when Val has suffered judgments in the amount of $115,000/$330,000, representing the total sum of the limits of the Schedule A policies plus the other available insurance.

There is no other specific indication of what is meant by the phrase "applicable limits of the underlying policies listed in Schedule A." Rather, we must apply appropriate canons of construction and interpretation to discern the meaning of that phrase. We turn to the law of New York for guidance in this task.

B

While our research has disclosed no cases directly on point, general principles of construction used by New York courts in interpreting insurance contracts give guidance. Rules for the construction of insurance contracts are those applied to other contracts. *Schering Corp. v. Home Insurance Co.,* 544 F.Supp. 613 (E.D.N.Y.1982) (citing New York cases). These rules include the time-honored maxim that any ambiguity must be resolved against the drafter. *Breed v. Insurance Company of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978). Insurance policies are to be liberally construed in favor of the insured, *Miller v. Continental Insurance Co.,* 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258 (1976), and if a policy is reasonably capable of more than one interpretation it should be construed to reflect the reasonable belief of the insured at the time he entered into the contract, *Walters v. Great American Indemnity Co.,* 12 N.Y.2d 967, 238 N.Y.S.2d 960, 189 N.E.2d 495 (1963).

These rules of liberality and favorable treatment do not give the courts carte blanche to fashion coverage in every case for the putative insured. We are required to look at the contract in its entirety to determine the purpose and intent of the parties and the effects they desired from the contract. *Murray Oil Products v. Royal Exchange Assurance Co.,* 21 N.Y.2d 440, 288 N.Y.S.2d 618, 235 N.E.2d 762 (1968). If there is no real doubt about what the parties to the contract intended, the rules of construction cannot be used to extend coverage beyond that reasonably and legitimately implied from the policy. The intent of the parties, if evident, must be enforced, and equitable considerations will not be em-

| Carrier, Policy Number & Period | Type of Policy | Applicable Limits |
|---|---|---|
| b) ALLSTATE | Automobile Liability | Bodily Injury Liability $100,000 each person $300,000 each occurrence<br><br>Property Damage Liability $ 10,000 each occurrence |

ployed to rewrite the terms of policy. *Breed v. Insurance Company of North America,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978).

■ The magistrate, applying similar rules of construction under North Carolina law, found that the phrase "applicable limits of the underlying policies listed in Schedule A" was reasonably subject to the interpretation urged by both parties here and thus construed the policy against the insurer. We think this was error because the policy, as a matter of law, is not so ambiguous as to obscure the real intent of the parties. The only reasonable construction of this policy is that the insurer's liability was not triggered until Val suffered judgments greater than $115,000/$330,000.

We are drawn to this conclusion by the plain meaning of the words used in the contested phrase. That phrase states that the retained limit of the insured is "the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other underlying insurance available to the insured." Under this formula, the retained limit is determined by totaling two sums: the applicable limits of any other underlying insurance, but only if this is expressly "*available* to the insured" (emphasis added), and the applicable limits of the policies listed in Schedule A. There is no stated requirement that the Schedule A policies be "available" to the insured, and the use of the adjective "available" in the sentence to modify one class of policies but not the other signifies that the coverage limits of the Schedule A policies apply in determining Val's retained limit even though he was not in fact insured under those policies.

Fried and Strasser urge that the use of the term "applicable limit" in reference to

each class of policies can reasonably be interpreted to mean that only those policies of either class that afford coverage should be considered in determining the retained limit. This construction is at odds with the language of the policy. Schedule A lists several policies that have different coverage limits for comprehensive personal liability and automobile liability, and there are also different limits for personal injury and property damage. The term "applicable limits," in relation either to the Schedule A or other underlying insurance policies, refers only to the *category* of coverage applicable to the incident from which the insured's liability arises. *See Wommack v. United States Fire Insurance Co.,* 323 F.Supp. 981, 985–86 (W.D.Ark.1971) ("applicable limits" of Schedule A policies unambiguously refers to dollar limits of the category of coverage regardless of whether the policies actually provided coverage).[5]

Beyond the plain language of the contested phrase, we are convinced that the intent of the parties was to achieve excess liability coverage above the threshold level of the face value of the Schedule A policies. The whole concept of these umbrella policies is to provide inexpensive coverage for unusual catastrophic losses above the limits of conventional primary coverage maintained by the average individual. 8A J. Appleman, *Insurance Law and Practice* § 4909.85 (Rev. ed. 1981). Mr. Palmer, several of his family members, and other relatives were each insured against catastrophic liability up to $1 million under the umbrella policy that cost approximately $100 per year. The low cost-high limit coverage, coupled with the limits stated in Schedule A covering the very type of event that occurred here, indicates that the parties to this contract of insurance intended the umbrella coverage to begin at $100,000/$300,000 plus other underlying amounts available to the insured.[6]

5. *Wommack* presented a situation very similar to the one at hand. A named insured acquired an umbrella policy with listed Schedule A policies having applicable limits of $100,000/$300,000. The named insured's son, an insured under the umbrella policy, was involved in a car wreck and the only insurance coverage on the wrecked car was an unlisted primary policy with $10,000/$20,000 limits. The insured sought a declaration that the term "applicable limits," in a policy almost identical to the one at issue here, meant the limits of those policies

actually affording coverage. The court disagreed, finding that the applicable limits of the Schedule A policies were to be used in determining the insured's retained limits under the umbrella policy even though the Schedule A policies extended no coverage to the insured for the car wreck.

6. Both parties to an insurance contract realize that, in determining both the insurable risk and the cost of the coverage, the insurer must know the point at which its liability will arise. In this

In sum, we find this policy language unambiguous and the intent of the parties discernible, so we dispense with the need to resort to other maxims of construction.[7] Although plaintiffs have suffered injuries for which they most likely will never be compensated, equitable considerations cannot be used to rewrite the terms intended by the parties. Fried and Strasser are attempting to turn the excess coverage intended by the contracting parties into a form of primary liability insurance because Val was not insured by the policies in Schedule A. This attempt must be unsuccessful in light of our reading of the policy and our understanding of the intent and purpose of the contracting parties. *Cf. Shames v. Homes Insurance Co.,* 73 A.D.2d 601, 422 N.Y.S.2d 122 (1979) (mem.) (insured cannot convert personal catastrophic liability insurance into primary coverage by failing to maintain the required underlying insurance).

### IV

The magistrate's opinion that the policy language was ambiguous is erroneous as a matter of law. We find from the unambiguous language of the policy that North River is not liable for the unsatisfied judgments held by Fried and Strasser, and the judgment of the magistrate must therefore be reversed.

REVERSED.

---

case both parties must have intended that there would be a fixed threshold at which the insurer's duty to pay would arise; this fixed amount is reflected by the applicable limits of the policies listed in Schedule A. To hold otherwise subjects the insurer to unforeseeable and variable risks depending upon the underlying insurance actually maintained by any one of the potential insureds.

7. Our decision that the extent of coverage provision in this policy is unambiguous and affords no coverage here frees us from having to decide an alternative theory advanced by the insurer. North River claims that Val breached Condition M of the policy and thus no coverage would arise until judgments totaling $100,-000/$300,000 were suffered. Condition M states:

M. Maintenance of Underlying Insurance. It is warranted by the insured that the underlying policies listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force as collectible insurance during the currency of this policy. In the event of failure by the insured to maintain such policies or to meet all conditions and warranties subsequent to loss under such policies, the insurance afforded by this policy shall apply in the same manner it would have applied had such policies been so maintained in force.

North River's position is that Val, as an insured, had the duty under Condition M to obtain underlying insurance as listed in Schedule A; if he did not do so, he would still be treated as if he had $100,000/$300,000 underlying insurance in determining his retained limit. Fried and Strasser argue that Val did not have an independent duty to obtain insurance, and that the specific policies were "maintained in force as collectible insurance" by Mr. Palmer; this argument is premised on their interpretation of the phrase "maintained in force as collectible insurance" as meaning only that the premiums on the Schedule A policies were fully paid and that the insurer was solvent.

While we need not reach this question, we note that the Fifth Circuit in an identical context has held that an insured must independently maintain underlying insurance in the amount of the schedule policies. *Ridgway v. Gulf Life Insurance Co.,* 578 F.2d 1026 (5th Cir.1978).