851 F.2d 957
 UNITED STATES FIRE INSURANCE COMPANY, INC., Plaintiff-Appellant,
v.
CHARTER FINANCIAL GROUP, INC., Houston Industrial Systems,
Inc., Woodland Feed Company, Inc., Benny R. Cleveland, M.D.,
James M. Hebert, D.D.S., Joe Whittington, "John Doe,"
Unknown Claimants, Defendants-Appellees.
 No. 87-2382.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 29, 1988.
Decided July 12, 1988.
 
 Stephen J. Peters, Stewart & Irwin, Indianapolis, Ind., for plaintiff-appellant.
 Jerry A. Garau, Price & DeLaney P.C., Indianapolis, Ind., for defendants-appellees.
 Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 An explosion damaged appellees' property. Appellant insurance company filed a declaratory judgment action to determine the extent of its coverage under an excess insurance policy. The district court ruled that the policy language was ambiguous, and therefore held that the insurance covered property damage in excess of $25,000. We disagree and therefore reverse.
 
 I.
 
 2
 United States Fire Insurance Company, Inc. ("USFIC") issued a one-year policy of $100,000 primary insurance coverage to Charter Financial Group, Inc. ("Charter") and Houston Industrial Systems, Inc. ("HIS") on January 24, 1981. On March 11, 1981, USFIC issued a second one-year policy of excess insurance to Charter and HIS. This "Commercial Comprehensive Catastrophe Liability Policy" covered personal injury liability, property damage, and advertising liability up to $2 million.
 
 
 3
 Charter was a general partner in Woodland Feed Company ("Woodland"). Woodland permitted Refuse Resource Recovery, Inc. to use its factory to conduct research experiments on converting bio-mass (essentially sawdust) into gasahol. On January 20, 1982, an explosion occurred at Woodland, damaging the factory and adjacent property.[1] Damage actions ensued in Indiana state court against Charter and Woodland.[2]
 
 
 4
 USFIC filed a declaratory judgment action in the district court[3] to determine the limit of its obligations under the policies. On January 22, 1985 the parties reached a partial settlement, agreeing that the primary policy did not cover the property damage resulting from the explosion at the Woodland factory because the defendants had failed to designate the Woodland partnership as a named insured.[4] The parties nonetheless agreed that the comprehensive excess policy did cover the property damage. The sole remaining issue for the district court was the determination of the threshold amount above which the excess policy covered the damage. USFIC argued for the higher of two possible figures, Charter and HIS for the lower.
 
 
 5
 Section I of the excess policy[5] provides coverage for property and other damage "in excess of the retained limit." Section V of the excess policy[6] defines the retained limit to be the greater of (a) the "applicable limits " of listed underlying policies, or (b) "an amount stated in item 4(C) of the declarations as the result of any one occurrence not covered by" the underlying policy (emphasis added). Item 4(C) lists a "self-insured retention" amount of $25,000. Charter contended, and the district court agreed, that because the underlying policy did not cover the Woodland explosion there were no applicable limits of the underlying policy within the meaning of Sec. V(a); the incident was therefore an "occurrence not covered" by the underlying policy under Sec. V(b). The district court thus found that the $25,000 amount stated in item 4(C), being greater than the zero applicable limits under Sec. V(a), constituted the "retained limit."
 
 
 6
 USFIC urges on appeal that the district court erred in finding the limits of the underlying policy inapplicable, because Charter's failure to list the Woodland partnership on the primary policy constituted a violation of a duty to "maintain" that policy in force. Condition 0 of the excess policy[7] provides that if the underlying policy is not maintained in force, the excess policy shall nonetheless be applied as if the underlying policy had been maintained in force. Therefore, USFIC argues, Condition 0 requires that the underlying policy be considered "in force" as to the Woodland partnership and thus applicable to the explosion for purposes of determining the "retained limit" under the excess policy. The "retained limit," appellant asserts, is therefore the $100,000 coverage of the primary policy (the "applicable limits of the underlying policies")[8] because it is greater than the $25,000 self-insured amount. Because we find that the limits listed in Schedule A were applicable, we do not reach the issue of whether Charter and HIS failed to "maintain" the primary policy under Condition 0.
 
 II.
 
 7
 The district court determined, and the parties do not dispute, that Indiana law governs the interpretation of this insurance contract. Ambiguous insurance policies are construed against the insurer. Sur v. Glidden-Durkee, 681 F.2d 490, 496-97 (7th Cir.1982) (citing Huntington Mut. Ins. Co. v. Walker, 181 Ind.App. 618, 392 N.E.2d 1182, 1185 (1979)). "The test for determining whether a contract is ambiguous is whether reasonable men would find the contract subject to more than one interpretation." Tastee-Freez Leasing Corp. v. Milwid, 173 Ind.App. 675, 365 N.E.2d 1388, 1390 (1977). We must look to the plain meaning of all contract provisions, endeavoring to "give effect to the intent of the parties at the time they formed the contract." Keystone Square Shopping Ctr. Co. v. Marsh Supermarkets, Inc., 459 N.E.2d 420, 422 (Ind.App.1984). When there is no real doubt about what the parties intended, in other words, we will not find the contract ambiguous. See J. Appleman, Insurance Law and Practice Sec. 7402. The question, therefore, is whether the excess insurance contract is reasonably susceptible to appellees' interpretation: that failure to designate Woodland as a named insured rendered the scheduled limits of the underlying policy "inapplicable" and thereby obligated USFIC to pay for all property damage above $25,000.
 
 A.
 
 8
 Several other courts have considered policy language fixing the lower limits of excess insurance coverage. Almost all of these reported cases deal with an insured's claim that the excess insurance should "drop down" to effectively become primary insurance when the underlying insurer has become insolvent. Courts have analyzed the policy language on a case by case basis. See Zurich Ins. Co. v. Heil Co., 815 F.2d 1122, 1125 (7th Cir.1987) (listing cases). Some have found the excess insurer liable to provide coverage down to the designated self-insured amount or lower; most have found no such "drop down" liability. When an excess policy provides that it will pay above any amounts "recoverable" from underlying insurers, courts have construed the policies against the excess insurers, holding them liable for the entire damage when the underlying insurer has become insolvent. At least two courts have found it a reasonable interpretation of such a contract that no insurance is "recoverable" from an insolvent company. See Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 640 P.2d 764, 180 Cal.Rptr. 628 (1982) (en banc); MacNeal v. Interstate Fire and Casualty Co., 132 Ill.App.3d 564, 477 N.E.2d 1322, 87 Ill.Dec. 794 (1985).
 
 
 9
 The majority of courts, however, have found that in the absence of language promising to pay above amounts "recoverable," excess insurance contracts do not obligate the excess insurer to provide primary coverage when the underlying insurer has become insolvent. The cases focus on the words describing the limit below which the excess insurance will not cover loss or damage. See, e.g., Mission Nat'l Ins. Co. v. Duke Transp. Co., 792 F.2d 550 (5th Cir.1986) ("limits of underlying insurance as set out" in schedule); Garmany v. Mission Ins. Co., 785 F.2d 941 (11th Cir.1986) (same); Continental Marble & Granite v. Canal Ins. Co., 785 F.2d 1258 (5th Cir.1986) (per curiam) (policy paid down to a designated amount if underlying insurance "inapplicable"); Radiator Specialty Co. v. First State Ins. Co., 651 F.Supp. 439 (W.D.N.C.), aff'd, 836 F.2d 193 (4th Cir.1987) ("limits ... indicated beside the underlying insurance listed"). These courts effectively held that the reference in the excess policies to underlying insurance related only to the stated limits of that listed underlying insurance. Therefore, the excess coverage started at the level of underlying insurance stated in Schedule A whether or not such primary insurance had been paid, was recoverable, or was even in effect on the date of the insurable event.
 
 
 10
 Several courts have reached this conclusion after examining language substantially similar to the language of the USFIC excess policy at issue here ("applicable limits of [listed] underlying policies"). See Steve D. Thompson Trucking, Inc. v. Twin City Fire Ins. Co., 832 F.2d 309 (5th Cir.1987); Fried v. North River Ins. Co., 710 F.2d 1022 (4th Cir.1983); Molina v. United States Fire Ins. Co., 574 F.2d 1176 (4th Cir.1978); Wommack v. United States Fire Ins. Co., 323 F.Supp. 981 (W.D.Ark.1971).[9] These courts found that the policy language unambiguously obligated the insurer to pay only the damage amount in excess of underlying insurance listed on the Schedule attached to the excess policy. In contrast to a promise to pay above amounts "recoverable," which may vary, the excess policies in these cases referenced a specific amount--like the $100,000 limit in the instant case. See MacNeal, 87 Ill.Dec. at 797, 477 N.E.2d at 1325. Similarly, the "total of the applicable limits of the underlying policies listed in Schedule A" of USFIC's excess policy describes the dollar amount listed on Schedule A under "general liability-property damage" as opposed to the other listed categories of primary insurance.[10] "The term 'applicable limits,' in relation ... to the Schedule A ... policies, refers only to the category of coverage applicable to the incident from which the insured's liability arises." Fried, 710 F.2d at 1026 (emphasis in original). Schedule A to USFIC's excess policy listed several underlying policies covering various categories of liability. The "applicable" limit referred to in Sec. V of USFIC's excess policy was clearly the $100,000 amount listed under property damage liability--the applicable category.
 
 B.
 
 11
 Although opinions construing similar excess insurance policies have conceded that the language was poorly chosen, Fried, 710 F.2d at 1024 ("not the plainest"); Garmany, 785 F.2d at 945 ("could have been clearer"); Continental Marble, 785 F.2d at 1259 ("awkward"), they have refused to find the contracts ambiguous. We agree with those courts that have examined policy language similar to the excess policy here and found it unambiguous. While these cases involved insolvent underlying insurers rather than failure to comply with the underlying policy, this is a distinction without a difference; the contract analysis is identical. Moreover, the appellees' primary policy covered damage from zero to $100,000 for an advance premium of $717; their excess policy covered a broader variety of damage up to $2 million for a premium of $600. The insureds' interpretation of the excess policy would allow them more than the benefit they bargained for. It could not have been within the contemplation of the parties that the insureds should be allowed to conceal dangerous activity which might be subject to increased premiums or deemed uninsurable under the primary policy, only to have such activity covered essentially free of charge under an excess policy. It is true that USFIC could have used clearer language, specifying (for instance) that the excess policy's coverage was contingent on the insureds' listing any activities not covered by a primary policy. That the language was imperfect, however, does not render the policy ambiguous. See Garmany, 785 F.2d at 945 & n. 4. We will not interpret the policy against the insurer in the face of its manifest purpose.[11]
 
 
 12
 USFIC has stipulated that the excess policy covers the explosion even though the underlying policy does not. It therefore admits bargaining for the risk of insuring some events that are not covered by the primary insurance. But it does not follow that the parties contemplated that the excess policy would cover property damage under $100,000 should the insureds violate the terms of the underlying policy. This would "transmogrify the policy into one guaranteeing" the insureds' compliance with the primary policy. See Continental Marble, 785 F.2d at 1259; Heil, 815 F.2d at 1125. The broad, "comprehensive" coverage of the excess policy indicates only that USFIC was willing to risk insuring down to $25,000 less common categories of losses (like advertising liability) not covered by the primary insurance. See Ridgway v. Gulf Life Ins. Co., 578 F.2d 1026, 1030 (5th Cir.1978); J. Appleman, Insurance Law and Practice Sec. 4909.85 (Excess insurance "policies often provide a primary coverage in areas which might not be included in the basic coverage, since it is the intent of the company to afford a comprehensive protection in order that such peace of mind may truly be enjoyed. In those areas, such coverage will, in fact, be primary.").
 
 C.
 
 13
 USFIC argues that, in any case, Condition 0 limits its liability to the face value of the primary insurance. It seems clear that the purpose of the maintenance clause is to prevent the insureds from rendering the excess insurer liable as a primary insurer simply by failing to acquire or pay premiums on the underlying policy. The excess insurer has assessed its risk based on the assumption that the insureds have or will procure and maintain the agreed upon primary policy. Cf. Heil, 815 F.2d 1122 (failure to comply with condition requiring maintenance of "collectible" insurance);[12] Johnson v. United States Fire Ins. Co., 586 F.2d 1291 (8th Cir.1978); Ridgway, 578 F.2d 1026 (held a failure to maintain where underlying policy never procured). But cf. Macalco, Inc. v. Gulf Ins. Co., 550 S.W.2d 883, 896 (Mo.Ct.App.1977) (Failure to maintain in force "would apply in case of a lapse or some situation arising between the time of obtaining [the] umbrella policy and the time of loss resulting in diminution or elimination of effect the underlying insurance had at an earlier time."); Pisciotta, 180 Cal.Rptr. at 635, 640 P.2d at 771 ("plain import of maintenance clause is that [excess insurer] refuses to allow the insured to expand the scope of [the excess insurer's] exposure by replacing the original primary policy with a second policy containing a narrower scope of coverage."). Because we conclude that the policy limits are "applicable," however, we do not reach USFIC's argument that Charter's omission to insure Woodland's activities under the primary policy constituted a "failure to maintain" that policy within the meaning of Condition 0. See Fried, 710 F.2d at 1027 n. 7.
 
 III.
 
 14
 USFIC and its insureds could not have thought they were contracting, for consideration of $600, for a comprehensive excess policy which would, essentially at the option of the insureds, indemnify property damages from $25,000 to $2 million. While USFIC could have explicitly stated that its property damage coverage began at $100,000, this was nonetheless the clear import of the policy language. We will not adopt a construction of the contract which could not reasonably have been within the contemplation of the parties at the time of its signing. We therefore agree with the Fourth Circuit that the intent of the parties upon entering into this contract provision "was to achieve excess liability coverage above the threshold level of the face value of the Schedule A policies." Fried, 710 F.2d at 1026. The decision of the district court is REVERSED.
 
 
 
 [1]
 The explosion killed Jack Whittington and injured Judson Brown. Apparently, no personal injury or death claim was brought; this appeal involves only liability for property damage
 
 
 [2]
 USFIC represented at oral argument that it has paid $124,000 as part of a settlement in Indiana state court
 
 
 [3]
 USFIC named as defendants the listed insureds (Charter and HIS), the Woodland Partnership, and the other Woodland general partners. The insurance company also named unknown "John Doe" tort claimants who might assert causes of action arising out of the explosion
 Jurisdiction in the district court was based on diversity of citizenship. USFIC, a New York corporation with its principal place of business in New York, successfully alleged diversity between itself and all identified defendants. It failed, however, to allege the citizenship of the unknown John Doe claimants. A plaintiff generally must prove the diverse citizenship of John Doe defendants in federal diversity actions. 14 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3642. See Bryant v. Ford Motor Co., 844 F.2d 602 (9th Cir.1987) (en banc); Abels v. State Farm Fire and Cas. Co., 770 F.2d 26 (3d Cir.1985) (exception where Doe defendants mere shams); 8 A.L.R.Fed. 675, Sec. 5.
 Because we find these claimants to be nominal parties, however, we disregard them for purposes of federal diversity jurisdiction. Rockwell Int'l Credit Corp. v. U.S. Aircraft Ins. Group, 823 F.2d 302, 304 (9th Cir.1987); Matchett v. Wold, 818 F.2d 574, 576 (7th Cir.1987), cert. denied --- U.S. ----, 108 S.Ct. 230, 98 L.Ed.2d 189 (1988); Kanzelberger v. Kanzelberger, 782 F.2d 774, 778 (7th Cir.1986). See also Harleysville Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 605 F.Supp. 133, 135 (W.D.Va.1985), rev'd in part on other grounds, 789 F.2d 272 (4th Cir.1986); 13B Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3606.
 The John Doe defendants are nominal parties to this action whose addition was a mere gesture; USFIC does not seek relief against or in favor of these defendants. See Harleysville, 605 F.Supp. at 135. More important, they have no legal interest in the action. Indiana is not a "direct action state"; tort claimants may not directly sue an insurer for damages or a declaratory judgment stemming from damage caused by an insured, under the rationale that the claimant is a stranger to the insurance contract. Wallace v. Doan, 155 Ind.App. 316, 292 N.E.2d 820 (1973); Winchell v. Aetna Life and Cas. Ins. Co., 182 Ind.App. 261, 394 N.E.2d 1114 (1979). The question of whether a particular policy covers the tortfeasor does not implicate the legal rights of tort claimants. See Iowa Public Serv. Co. v. Medicine Bow Coal Co., 556 F.2d 400, 404 (8th Cir.1977). Moreover, the John Does were never issued summons in this case, the applicable statute of limitations has expired as to any unknown tort claimants, and the underlying lawsuit has been settled. Appellants and appellees concur in their request that we disregard these parties and we can say with assurance that the presence of the Does did not in any way affect the conduct of this litigation. Because the John Doe defendants are therefore merely nominal parties who have no interest in the action, we disregard them for purposes of diversity jurisdiction.
 
 
 [4]
 Part II of the underlying policy provided that the insurance did not apply to "bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in the policy as a named insured."
 
 
 [5]
 I. Coverage
 The Company agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, arising out of an occurrence or assumed by the insured under contract, for
 (a) Personal Injury Liability,
 (b) Property Damage Liability, or
 (c) Advertising Liability
 .... (Emphasis added).
 
 
 [6]
 V. Retained Limit--Limit of Liability
 With respect to Coverage 1(a), 1(b) or 1(c), or any combination thereof, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
 (a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other insurance collectible by the insured; or
 (b) an amount as stated in Item 4(C) of the declarations as the result of any one occurrence not covered by the said policies or insurance;
 and then up to an amount not exceeding the amount as stated in Item 4(A) of the declarations [$2 million] as the result of any one occurrence.
 
 
 [7]
 O. Maintenance of Underlying Insurance. It is warranted by the insured that the underlying policies listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force during the currency of this policy, except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences happening during this policy period. In the event of failure by the insured to so maintain such policies in force or to meet all conditions and warranties subsequent to loss under such policies, the insurance afforded by this policy shall apply in the same manner it would have applied had such policies been so maintained in force. Notice of exhaustion of underlying insurance shall be given the company within 30 days of such exhaustion
 
 
 [8]
 Schedule A lists a second underlying property insurance policy issued by St. Paul Insurance Company in the amount of $100,000. No party addressed the existence or status of this policy in the briefs or at argument, however, and we treat as waived any argument that the St. Paul policy is relevant to determining the "total of the applicable limits of the underlying policies" under the USFIC excess policy
 
 
 [9]
 Although these decisions were all based on an analysis of the relevant contract language, many cite policy reasons why excess insurers should not be transformed into primary insurers. See Thompson Trucking, 832 F.2d at 310-11; Fried, 710 F.2d at 1026 ("The whole concept of these umbrella policies is to provide inexpensive coverage for unusual catastrophic losses above the limits of conventional primary coverage...."); Whitehead v. Fleet Towing Co., 110 Ill.App.3d 759, 442 N.E.2d 1362, 1366, 66 Ill.Dec. 449, 453 (1982) (liability attaches under excess policy "only after a predetermined amount of primary coverage has been exhausted.... This reduced risk is reflected in the cost of the policy.")
 
 
 [10]
 The other listed categories were "general liability--bodily injury," "automobile liability--property damage," and "workers compensation--employee liability."
 
 
 [11]
 Charter and HIS also point out that "Endorsement 613 SR" to the excess policy provides a specific checklist of circumstances in which USFIC would not provide excess coverage without applicable primary coverage. The Endorsement stated:
 Excess Policy 613 SR Form
 EXCESS FOLLOWING UNDERLYING INSURANCE
 Coverage for claims arising out of the provisions set forth below and
 designated with an "x" is limited in this policy to the coverage provided to
 the insured in primary policies listed in Schedule A, attached to this
 policy. If coverage is not provided by such policies, coverage is excluded
 from this policy.
 x 1. To liability assumed by the insured under
 contract.
-------------
_____________ 2. To PRODUCTS HAZARD, as defined in Insuring
 Agreement III, Definition 6 of this policy.
_____________ 3. To PERSONAL INJURY, as defined in Insuring
 Agreement III, Definition 2 of this policy.
_____________ 4. To liability arising out of the ownership,
 operation, maintenance, use, loading or
 unloading of watercraft.
_____________ 5. To liability resulting from false arrest, false
 imprisonment, wrongful eviction, wrongful
 detention, malicious prosecution, invasion of
 rights of privacy.
 All other terms and conditions of this policy remain unchanged.
 Authorized Representative
 Appellant indicated on the endorsement only that any liability assumed by Charter and HIS under contract was required to be covered by primary insurance. Although this too indicates that USFIC could have been clearer, it does not render the language "applicable limits" ambiguous. Form 613SR merely allows the insurer to exclude from excess coverage categories of damage which may not be covered by the listed underlying insurance. Categories which are covered, like property damage, would not need to be designated.
 
 
 [12]
 In Heil, one of the underlying insurers became insolvent, leaving a gap between the $300,000 provided by another primary policy and the $4 million floor of Zurich's excess policy. Zurich had agreed to pay the greater of "the limits of liability shown for the underlying insurance (listed in Schedule A hereof)" or the $10,000 self-insured amount. We held that because Heil was required to maintain the primary insurance in force "as collectible insurance," Zurich was not liable to "drop down."