SEATS INCORPORATED, a Wisconsin Corporation, Plaintiff-Respondent,†

v.

NUTMEG INSURANCE COMPANY, and Hartford Insurance Group, a Foreign Insurance Corporation, Defendants-Appellants.

Court of Appeals

*No. 92–0857. Submitted on briefs September 16, 1992.—Decided June 17, 1993.*

(Also reported in 504 N.W.2d 613.)

†Petition to review filed.

For the defendants-appellants the cause was submitted on the briefs of *Harry Sauthoff, Jr.* of *LaRowe & Gerlach, S.C.* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Clyde C. Cross* of *Cross, Jenks, Mercer and Maffei* of Baraboo.

Before Gartzke, P.J., Dykman and Sundby, JJ.

DYKMAN, J. Nutmeg Insurance Company appeals from a grant of summary judgment to Seats Incorporated holding Nutmeg liable for costs incurred by Seats to defend and settle a product liability suit. The issue is whether the trial court erred in determining that Nutmeg's excess policy did not require Seats to carry underlying insurance coverage, and that any recovery by Seats was subject only to a $10,000 self-insured retention.

We conclude that the policy did require Seats to maintain underlying insurance coverage. Furthermore, because the settlement fell within the applicable limit of underlying insurance and Nutmeg had no obligation to defend the suit, we conclude that Seats was not entitled to recover any costs associated with the product liability action. Accordingly, we reverse and remand for the trial court to determine whether summary judgment should be granted to Nutmeg, the nonmoving party, pursuant to sec. 802.08(6), Stats.

## BACKGROUND

Nutmeg issued an umbrella liability policy to Seats, a manufacturer of seating installed in trucks. The policy provided up to $25,000,000 in coverage for losses which exceeded either the limit of an underlying insurance policy, or when no underlying policy applied, the amount of a self-insured retention, listed as $10,000 in the policy's declarations. Seats paid a premium of $18,650 for a one-year term commencing December 1, 1984.

In addition to the Nutmeg policy, Seats carried a primary comprehensive general liability policy with Holland-America Insurance Company (HAIC). The primary policy had a single liability limit of $500,000 and was in force for the same term as Nutmeg's excess policy. HAIC became insolvent, and in February 1987, it was placed in liquidation by order of the Los Angeles County Superior Court.

In October 1988, Tricia Whittle, a minor, filed a lawsuit against Seats in California for injuries she sustained in a motor vehicle accident in June 1985. Seats tendered defense of this action to Nutmeg. Nutmeg declined, asserting that it had no duty to defend because the applicable limit for underlying insurance, $500,000, had not yet been exhausted. Seats incurred over $53,500 in attorneys' fees and other costs, and eventually compromised the claim for $37,500.

Seats brought this action for breach of contract, alleging that it was not required by Nutmeg's policy to obtain underlying insurance coverage. Seats moved for summary judgment and the motion was granted. The trial court held the policy was subject only to the self-insured retention because the schedule of underlying insurance policies failed to identify any policies by carrier or policy number. Consequently, the trial court

222

awarded damages of $81,419 to Seats, an amount equal to its costs to defend and settle the California action, less the $10,000 self-insured retention. This appeal ensued.

## STANDARD AND SCOPE OF REVIEW

Resolution of the issue on appeal requires construction of an insurance policy. Such construction presents a question of law which we review *de novo. Maas v. Ziegler*, 172 Wis. 2d 70, 79, 492 N.W.2d 621, 624 (1992). Because there are no factual issues to be determined, summary judgment is an appropriate disposition of this case. *Grotelueschen v. American Family Mut. Ins. Co.*, 171 Wis. 2d 437, 446, 492 N.W.2d 131, 134 (1992).

The interpretation of insurance policies is governed by the same principles of construction which apply to contracts in general. *Maas*, 172 Wis. 2d at 79, 492 N.W.2d at 624. In construing a policy, our objective is to give effect to the intention of the parties. *Id.* "The test is not what the insurer intended the words to mean, but what a reasonable person in the position of the insured would have understood them to mean." *Id.* at 81–82, 492 N.W.2d at 625.

Where the policy terms are unambiguous, we apply those terms to the facts rather than engage in construction. *Grotelueschen*, 171 Wis. 2d at 447, 492 N.W.2d at 134. If an ambiguity exists, we construe the policy language against the insurance company that drafted the policy. *Maas*, 172 Wis. 2d at 79, 492 N.W.2d at 624. Policy provisions are ambiguous when they are "reasonably or fairly susceptible to more than

one construction." *Id.* However, a term is not ambiguous simply because it is not defined in the policy, or because the parties may disagree about its meaning. *United States Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 503–04, 476 N.W.2d 280, 282 (Ct. App. 1991). Finally, we will not interpret a policy so as to render an endorsement meaningless if the policy is "susceptible of another construction which gives effect to all of the policy's provisions and is consistent with the general intent." *Maas*, 172 Wis. 2d at 81, 492 N.W.2d at 625.

## RELEVANT PROVISIONS

The provisions of the policy which are the focus of this dispute are set out below.

With respect to coverage, the policy states:[1]

The company will pay on behalf of the **insured ultimate net loss** in excess of the total applicable limit (as stated in the Extension Schedule of **Underlying Insurance** Policies) of **underlying insurance** or the amount of the **self-insured retention** when no **underlying insurance** applies, because of **bodily injury, personal injury, property damage** or **advertising injury** to which this insurance applies, caused by an **occurrence.** [Footnote omitted.]

In the section containing definitions, the policy provides:

"**[U]nderlying insurance**" means the insurance policies listed in the Extension Schedule of **Underlying Insurance** Policies, including any renewals or replacements thereof, which provide the underlying coverages and limits stated in the Extension

---

[1] The emphasis in all quotes from the policy appears in the original document.

224

Schedule of **Underlying Insurance** Policies. The limit of **underlying insurance** includes any deductible amount, any participation of the **insured** or any **self-insured retention** beneath any such policy, less the amount, if any, by which the aggregate limit of such insurance has been reduced by payment of loss with respect to **occurrences** during the policy period of this policy. The coverages and limits of such policies shall be deemed to be applicable regardless of (1) any defense which the underlying insurer may assert because of the **insured's** failure to comply with any condition of such policy or (2) the insolvency of the underlying insurer.

In the policy's declarations, the fourth item sets the self-insured retention at $10,000, and the sixth item, regarding underlying insurance, states: "SEE ATTACHED EXTENSION SCHEDULE OF UNDERLYING INSURANCE POLICIES FORMING A PART OF POLICY."

Finally, Endorsement No. 4, entitled "SUPPLEMENTAL SCHEDULE OF PRIMARY INSURANCE," lists three separate types of coverage which were to be maintained by Seats for the period from December 1, 1984, to December 1, 1985. They are: (1) comprehensive general liability (including product liability) with a combined single limit of $500,000 for bodily injury and property damage for each occurrence, and in the aggregate, where applicable; (2) automobile liability with a combined single limit of $500,000 for bodily injury and property damage for each occurrence; and (3) employer's liability with a limit of $100,000 per accident. In the column headed "POLICY NUMBER," the phrase "to be determined" appears opposite each type of insurance policy. The "COMPANY" column is blank for all three policy types.

## INSOLVENCY OF HAIC

Nutmeg devotes the majority of its brief to the argument that it was not required to " 'drop down' to occupy the position of the primary carrier [HAIC]" in the event of HAIC's insolvency. Nutmeg cites the following policy clause in support of its position: "The coverages and limits of such policies [underlying insurance policies] shall be deemed to be applicable regardless of . . . (2) the insolvency of the underlying insurer." However, we do not address this argument because Seats concedes that Nutmeg could not be held liable to Seats by virtue of HAIC's insolvency.

## REQUIREMENT FOR UNDERLYING INSURANCE

Seats offers the same three arguments it raised before the trial court to support its position that underlying insurance was not required by Nutmeg's policy. First, Seats claims that underlying insurance and the self-insured retention are mutually exclusive alternatives.[2] Therefore, the inclusion of a self-insured retention in the policy's declarations is an unequivocal indication that Seats would only have been liable for the first $10,000 of loss arising from an occurrence such as the Whittle suit. We disagree.

■
While giving effect to the self-insured retention provisions, Seats' interpretation completely neutralizes Endorsement No. 4. The clause, "of **underlying insurance** or the amount of the **self-insured reten-**

---

[2] The contention is based on the following clause from the policy:

> The company will pay on behalf of the **insured ultimate net loss** in excess of the total applicable limit . . . of **underlying insurance** or the amount of the **self-insured retention** when no **underlying insurance** applies . . . .

**tion** when no **underlying insurance** applies," could also reasonably be construed to mean that Nutmeg would insure losses above $10,000 for "less common categories" of occurrences, such as advertising injury, which would not have been covered by any of the three types of policies listed in Endorsement No. 4. *See United States Fire Ins. Co. v. Charter Fin. Group*, 851 F.2d 957, 962–63 (7th Cir. 1988). Because an interpretation giving effect to all policy provisions is preferable to one which renders a provision meaningless, we adopt the alternative construction and reject Seats' argument. *See Maas*, 172 Wis. 2d at 81, 492 N.W.2d at 625.

Next, Seats points out that although both the definition of underlying insurance and the declarations refer to an "Extension Schedule of Underlying Insurance Policies," no schedule bearing that heading is incorporated in the policy. Rather, the policy includes a "Supplemental Schedule of Primary Insurance" in Endorsement No. 4. Seats suggests that the discrepancy is ambiguous. Because we strictly construe any ambiguity in a contract against the scrivener, Seats argues that we must conclude that there was no underlying insurance requirement in this policy.

The trial court implicitly rejected this argument by referring to Endorsement No. 4 as the extension schedule. Similarly, we reject the argument because there is no genuine ambiguity created by the term "primary insurance." Seats concedes that "in ordinary parlance," primary insurance and underlying . insurance are synonymous terms, and that any distinctions drawn between the terms "may properly be considered as mere semantics." Because the terms are interchangeable in everyday discourse, we conclude that a reasonable insured would readily recognize that

Endorsement No. 4 would serve the same function as an "Extension Schedule of Underlying Insurance Policies." Furthermore, were we to accept Seats' premise, we would render the endorsement superfluous, contrary to the *Maas* rule.

Finally, Seats contends that because Endorsement No. 4 fails to identify the required policies by number or insurer, any recovery under the policy, as written, was subject only to the self-insured retention. This argument also fails.

Endorsement No. 4 indicates on its face that it was issued October 7, 1985, and that it was effective as of December 1, 1984.[3] We are not convinced that a reasonable insured could inspect the endorsement, which was deliberately prepared ten months into the policy term and given retroactive effect, and conclude that Nutmeg had yet to decide whether to require underlying insurance. We believe that a reasonable insured could draw only one conclusion from Endorsement No. 4 — that Nutmeg required the insured to keep the three types of underlying or primary coverage in force, in the specified amounts, for the same period the Nutmeg policy was in effect.

We also reject this argument because, once again, Seats is urging us to adopt a construction which renders Endorsement No. 4 useless, despite the fact that the policy could reasonably be read to give effect to the

---

[3] In its memorandum decision, the trial court noted that Endorsement No. 4 was dated several months after Whittle's accident on June 29, 1985. We believe that such a fact is irrelevant for two reasons. First, the effective date of the endorsement preceded the accident by nearly seven months. Second, there is no evidence in this record that any party to this action had any notice of Whittle's injuries prior to the commencement of her lawsuit in October 1988.

endorsement. The endorsement could be viewed as requiring Seats to maintain the types of underlying coverage listed, with Nutmeg to verify the specific information concerning insurers and policy numbers at a later date.

Based on the foregoing discussion, we conclude that Seats was required to keep an underlying comprehensive general liability policy in force which would have applied to the Whittle suit. Furthermore, because the $500,000 limit of the required underlying policy had not been exhausted, we conclude that Nutmeg had neither a duty to defend Seats[4] nor an obligation to reimburse Seats for settlement costs.[5]

## DUTY TO DEFEND

Seats claims that even if we determine that underlying insurance had been required, Nutmeg still had the duty to defend the product liability suit. Seats

---

[4] We base our conclusion on the following provision:

With respect to **bodily injury, personal injury, property damage** or **advertising injury** covered under this policy (whether or not the **self-insured retention** applies) and
(1)   for which no coverage is provided under any **underlying insurance**; or
(2)   for which the underlying limits of any **underlying insurance** policy have been exhausted solely by payments of **damages** because of **occurrences** during the period of this policy,
The company will
(a)   defend any **suit** against the **insured** seeking **damages** on account thereof . . . .

[5] This conclusion results from the following clause:

The limit of **underlying insurance** includes any deductible amount . . . less the amount, if any, by which the aggregate limit of such insurance has been reduced by payment of loss with respect to **occurrences** during the policy period of this policy.

arrives at this conclusion in three steps: (1) the underlying insurance coverages in Endorsement No. 4 do not call for Seats to procure coverage for defense costs; (2) under *Gross v. Lloyds of London Ins. Co.*, 121 Wis. 2d 78, 84, 358 N.W.2d 266, 269 (1984), and *Professional Office Bldgs., Inc. v. Royal Indem. Co.*, 145 Wis. 2d 573, 427 N.W.2d 427 (Ct. App. 1988), "coverage for defense costs is a distinct and separate coverage in liability insurance policies"; and (3) combining (1) and (2), "Nutmeg obligated itself to provide defense cost coverage . . . through the underlying insurance or self-insured retainer limitations . . . ." This argument is without merit.

The clauses cited in footnote 4 above clearly precluded any obligation on Nutmeg's part to defend Whittle's personal injury action. Furthermore, in *Gross*, the supreme court declared: "Policies of liability insurance impose two duties on the insurer with respect to the insured — the duty to indemnify and the duty to defend." 121 Wis. 2d at 84, 358 N.W.2d at 269. This declaration hardly supports the proposition that primary insurers could write policies to indemnify, but not defend. If anything, this quote suggests that any statements concerning coverage for defense costs in Endorsement No. 4 would have been completely superfluous.

Based on our conclusion that Nutmeg had no liability for Seats' costs to defend or settle the Whittle action, we reverse the judgment. Had Nutmeg filed a cross-motion for summary judgment, we would have directed the trial court to dismiss the complaint upon remand. But while sec. 802.08(6), Stats., permits granting summary judgment to the nonmoving party, such a determination is within the trial court's discretion. *Homa v. East Towne Ford, Inc.*, 125 Wis. 2d 73, 77

n.6, 370 N.W.2d 592, 594 n.6 (Ct. App. 1985). We may not exercise the trial court's discretion. *Wisconsin Ass'n of Food Dealers v. City of Madison,* 97 Wis. 2d 426, 434–35, 293 N.W.2d 540, 545 (1980). Therefore, we direct the trial court to determine upon remand whether summary judgment should be granted to Nutmeg under sec. 802.08(6).

*By the Court.*—Judgment reversed and cause remanded with directions.

SUNDBY, J. (*concurring in part; dissenting in part*). I conclude that the sole question in this case is whether Seats and Nutmeg agreed that Seats was to obtain "underlying insurance" as a condition of coverage under Nutmeg's umbrella policy. There may be a simple answer to this question; however, I cannot find one. The complaint, answer, affidavit, motions, and the parties' briefs do not answer the question. I conclude that on the record before us, it is inappropriate to grant summary judgment to either party. I therefore concur in our mandate reversing the judgment in favor of Seats, but dissent from our opinion and mandate which allows the trial court to grant judgment to Nutmeg on the present record.

There is no evidence in the record that Seats was required to obtain "underlying insurance" as a condition of coverage under Nutmeg's umbrella policy. Nutmeg agreed to provide coverage to Seats in excess of the underlying insurance policies *listed* in the policy's Extension Schedule, or Seats' self-insured retention of $10,000 if underlying insurance was not available. No insurance policies were listed in Endorsement No. 4, which the trial court correctly concluded was the Extension Schedule; Endorsement No. 4 listed

231

required coverages and limits, but did not list the names of underlying insurance carriers or policy numbers.

The trial court gave a literal construction to Nutmeg's policy's statement of coverage and its definition of "underlying insurance." It granted summary judgment to Seats because neither the policy or Endorsement No. 4 listed any underlying insurance policies issued to Seats as required by the definition of "Underlying Insurance."[1] The court therefore concluded that Nutmeg's policy was in excess of the amount of the self-insured retention of $10,000.

The majority rejects this literal interpretation because it renders Endorsement No. 4 "superfluous," "meaningless" or "useless." I agree that "[o]ther things being equal, a construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless." *Stanhope v. Brown County*, 90 Wis. 2d 823, 848–49, 280 N.W.2d 711, 722 (1979). I also believe that we should not give a construction to an insurance policy which leads to an unreasonable or absurd result. Nutmeg argues, for example, that it could not reasonably be expected to extend $25,000,000 coverage to Seats for an annual premium of $18,650.[2] *See, e.g., Morbark Indus. v. Western Employers Ins. Co.*, 429 N.W.2d 213,

---

[1] The trial court also noted, and apparently relied on another very troubling aspect of this case. Although Nutmeg's policy term was for the period from December 1, 1984, to December 1, 1985, Endorsement No. 4 was dated October 7, 1985, "a date several months after the occurrence giving rise to this litigation." We find no explanation in the record.

[2] However, this court cannot take judicial notice that an annual premium of $18,650 is so ludicrously low that no insured could reasonably expect the kind of coverage Seats claims the

232

216 (Mich. Ct. App. 1988). To give some meaning to Endorsement No. 4, the majority accepts Nutmeg's argument that: "A reasonable insured could only interpret Nutmeg's policy as providing excess coverage over the policies and limits of liabilities set forth in Endorsement No. 4."

However, the uncontroverted fact is that no insurance policies were ever listed in the policy's Endorsement No. 4. Nutmeg wrote the policy and, in the absence of evidence of a contrary agreement, must live with its policy language.

Nutmeg asks this court to rewrite its definition of "underlying insurance" to mean "the limits of liability listed in the Extension Schedule of Underlying Insurance Policies . . . ." But Nutmeg could have written its policy to specifically declare its coverage limits without referring to other policies. Other excess or umbrella insurance carriers have avoided the construction problem presented by Nutmeg's policy by expressly stating coverage limits. *See, e.g., Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1121–22 (11th Cir. 1990) (company's policy provided "[t]he Company's liability shall be only for the ultimate net loss in excess of the Insured's retained limits defined as the greater of: (a) an amount equal to the limits of liability *indicated beside* the underlying insurance listed in the Schedule of Underlying Insurance hereof, plus applicable limits of any other underlying insurance collectible by the insured . . .") (emphasis added). *See also Steve D. Thompson Trucking, Inc. v. Twin City Fire Ins. Co.*, 832 F.2d 309, 310 (5th Cir. 1987) (policy defined "underlying limit" to mean "the amounts of the applicable limits of liability of the underlying insurance as stated in the

express language of the policy provided. We do not have sufficient information from which to draw this conclusion.

233

Schedule of Underlying Insurance Policies . . ."); *Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1124 (7th Cir. 1987) ("ultimate net loss" defined to include "the limits of liability shown for the underlying insurance (listed in Schedule A hereof) . . ."); *Mission Nat'l Ins. Co. v. Duke Transp. Co.*, 792 F.2d 550, 551 (5th Cir. 1986) (policy referred to "the limits of the underlying insurance as set out in the attached schedule . . ."); *Holland v. Stanley Scrubbing Well Serv.*, 666 F. Supp. 898, 900 (W.D. La. 1987) ("underlying limit" defined as "the amounts of applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Policies . . .").

I acknowledge that there are inferences which support the conclusion that the parties intended that Nutmeg's policy was to provide coverage only in excess of the limits of liability shown in the Supplemental Schedule of Primary Insurance. First, there is the nature of excess insurance:

> [E]xcess insurance may be called pure, true, straight or umbrella. "True" excess liability insurance is written on the basis and understanding that underlying insurance will be (or was already) obtained and continued. Unlike liability insurance which would otherwise be primary, and which becomes secondary only because of the presence of other insurance, true excess insurance depends upon the existence of underlying insurance and liability will not attach until the limits of the underlying primary policy have been exhausted. Thus, the true excess liability insurance company accounts for the reduced risks and charges premiums accordingly.

1 A.N. BROOK ET AL., BUSINESS INSURANCE LAW AND PRACTICE GUIDE, *Umbrella and Excess Liability Insurance,*

§ 4.02[2], at 4–19 (Matthew Bender 1992). Generally, excess policies apply only to specific risks whereas umbrella policies are not so limited. *Id.* § 4.03[1], at 4–23. Nutmeg's policy is a true umbrella policy which is not limited to specific risks.

However, unless otherwise required by the excess or umbrella policy, a policyholder may elect to be self-insured up to the layer of excess insurance. *Id.* § 4.02[2], at 4–20. "If the policyholder elects not to purchase a primary policy[,] but instead, maintains a self-insured retention for the same amount, then the policyholder would be obligated to provide for its own defense and to pay any settlement or judgment that falls within that retention. Under such an arrangement, the true excess insurance company has no indemnity obligation until the underlying self-insured retention is exhausted." *Id.*

Another fact from which an inference may be drawn is that Seats obtained primary comprehensive general liability coverage, including products liability coverage from Holland-America, in the amount of $500,000 for the same period covered by Nutmeg's policy. However, Nutmeg does not argue that Seats obtained the Holland-America coverage in response to any duty imposed upon Seats under Nutmeg's policy. Nutmeg merely notes that the Holland-America policy "corresponds precisely with the coverages and policy limits listed in Nutmeg's Extension Schedule." No reference to the Holland-America policy, or any other policy, is found in Nutmeg's policy issued to Seats.

For these reasons, I conclude that neither party is entitled to summary judgment. I join in the court's reversal of the summary judgment in favor of Seats but I believe that the record is insufficient to grant sum-

mary judgment to Nutmeg dismissing Seats' complaint.