**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE YAFFE COMPANIES, INC.,

Plaintiff - Appellant,

v.

GREAT AMERICAN INSURANCE
COMPANY, INC.,

Defendant - Appellee.

No. 06-7057

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 05-CV-466-FHS)**

---

Harvey D. Ellis, Jr. (Kevin D. Gordon and Jesse C. White, with him on the brief),
Crowe & Dunlevy, Oklahoma City, Oklahoma, for Plaintiff - Appellant.

Edward J. Main (James K. Secrest, II, and Roger N. Butler, Jr., with him on the
brief), Secrest, Hill & Butler, Tulsa, Oklahoma, for Defendant - Appellee.

---

Before **BRISCOE**, **HARTZ**, and **GORSUCH**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

This appeal arises out of a claim under a commercial umbrella insurance

policy. The district court entered summary judgment in favor of Great American

Insurance Company, Inc., denying the claim of the Yaffe Companies, Inc. on the

ground that the policy unambiguously precluded coverage. *Yaffe Cos., Inc. v. Great Am. Ins. Co.*, No. CV-05-466-FHS, 2006 WL 1388448, at *3, *5 (E.D. Okla. May 12, 2006). We hold that the policy is ambiguous and reverse and remand for further proceedings.

## I.    BACKGROUND

On December 28, 2004, an explosion at Yaffe's scrapyard in Muskogee, Oklahoma, caused significant property damage and bodily harm. When it filed its complaint, Yaffe had incurred $1,785,986.89 in liability on claims by numerous parties. Two insurance policies cover Yaffe's liability. One is a commercial general-liability policy issued by ACE American Insurance Company (ACE). The policy provides coverage up to $1,000,000 per occurrence, with a general aggregate limit of $2,000,000 and a deductible of $10,000 per claim. The other policy is a commercial umbrella policy with Great American. As a general matter, umbrella policies provide two types of insurance coverage: (1) excess coverage for events also covered by other underlying insurance policies that provide primary protection and (2) primary coverage for events not covered by other policies. *See Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 (1st Cir. 1993). The Great American policy has a coverage limit of $25,000,000. But its excess coverage does not begin until the amount that Yaffe "becomes legally obligated to pay," Great American policy § I, exceeds the policy's "Retained Limit," which is "the total amounts stated as the applicable

limits of the underlying policies [in the policy schedule]," *id.* § II.G.1. (Citations to the Great American policy, Aplt. App. Vol. I at 73–132, will refer to sections of the policy rather than pages of the appendix.)

The source of the difficulty in this case is the type of deductible in the ACE policy. The deductible is $10,000 per *claim*. That the deductible is per-claim rather than per-occurrence is apparently unusual. *See* 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 9.02, at 557 (2006) (in commercial general-liability policies "there is typically one deductible for each occurrence"). The nature of the deductible makes a substantial difference in the ACE policy's coverage of the Muskogee explosion. Because most claims were under $10,000, the policy covers only $497,999.10 of Yaffe's total liability of $1,785,986.89. If the $10,000 deductible had been per occurrence, ACE would have had to pay $1,000,000, and there would be no dispute that Great American must cover the total liability in excess of $1,000,000 (or perhaps $1,010,000).

Yaffe sought coverage from Great American in the amount of $785,986.89, the difference between the total amount of the claims against it arising from the explosion and $1,000,000. (Yaffe also raised a separate claim, but it is not pursued on appeal.) Great American denied the claim, noting that ACE had paid only $497,999.10 and asserting that the Great American policy does not provide coverage until the $1,000,000 limit of the ACE policy has been exhausted.

On October 14, 2005, Yaffe filed an action against Great American in Oklahoma state court, claiming that Great American had breached its insurance contract and seeking a declaration of coverage. Great American timely removed the case to the United States District Court for the Eastern District of Oklahoma on November 21, 2005, claiming diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because Yaffe is an Oklahoma corporation with its principal place of business in Oklahoma and Great American is an Ohio corporation with its principal place of business in Ohio. The next day Great American filed a counterclaim against Yaffe, seeking a declaration that it has no obligation to provide coverage on claims arising from the Muskogee explosion until Yaffe has exhausted the ACE policy's $1,000,000 limit.

On March 28, 2006, Great American moved for summary judgment. Yaffe responded and Great American replied. On April 21, shortly after Great American filed its reply in support of summary judgment, Yaffe moved to compel discovery, seeking information and documents from Great American regarding its construction of its umbrella policies with similar language. Yaffe then filed its own motion for summary judgment on May 5.

One week later, before Great American had filed a response to Yaffe's summary-judgment motion, the district court granted Great American's summary-judgment motion while denying Yaffe's motion. It ruled that the Great American policy is unambiguous and that Great American is obligated to make payments

under its policy only "when Yaffe becomes legally obligated to pay sums in excess of or, stated another way, after exhaustion of, the $1,000,000 coverage provided by the ACE policy." *Yaffe*, 2006 WL 1388448, at *3. The district court also denied Yaffe's motion to compel discovery, reasoning that such information, "while potentially relevant to a tort claim for bad faith," had no relevance to the contract claims because it had determined that the contract was to be interpreted based on its language alone. Aplt. App. Vol. 2 at 519 (Op. & Order, May 12, 2006). Judgment was entered the same day.

Yaffe appeals the grant of summary judgment to Great American, the denial of its own summary-judgment motion, and, in the alternative, the denial of its motion to compel discovery.

## II. DISCUSSION

### A. Standard of Review

"[A]n order denying summary judgment is reviewable when . . . it is coupled with a grant of summary judgment to the opposing party." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002); *see McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993) ("Where we reverse a summary judgment order in favor of one party, . . . we will review the denial of the other party's cross-motion for summary judgment under the same standards applied by the district court so long as it is clear that the party opposing the cross-motion had an opportunity to dispute the material facts."); James Wm.

Moore et al., Moore's Federal Practice § 56.41[1], at 56-284.1 (3d ed. 2006); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2715, at 268 (3d ed. 1995). Thus, we review both the grant of summary judgment to Great American and the denial of summary judgment to Yaffe. "We review de novo a district court's grant or denial of summary judgment, and we apply the same legal standard to be employed by the district court under Federal Rule of Civil Procedure 56(c)." *Maldonado v. City of Altus*, 433 F.3d 1294, 1302 (10th Cir. 2006) (brackets and internal quotation marks omitted), *overruled on other grounds as recognized by Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

**B.    Motions for Summary Judgment**

Yaffe contends that summary judgment for Great American was improper, and summary judgment for it was proper, because (1) the policy's unambiguous terms require Great American to provide coverage once Yaffe's liability for the explosion exceeded $1,000,000, and (2) even if the policy is ambiguous, that ambiguity must be construed against the drafter and in favor of Yaffe's reasonable expectations of insurance coverage. Great American counters that summary judgment was proper because the terms of its policy unambiguously indicate that it is not obligated to provide coverage until the $1,000,000 per-

-6-

occurrence limit of the ACE policy has been exhausted. It makes no alternative

argument in the event that we hold the policy to be ambiguous.

Oklahoma substantive law applies to this diversity action. *See Air Liquide*

*Am. Corp. v. Cont'l Cas. Co.*, 217 F.3d 1272, 1275 (10th Cir. 2000). Its approach

to interpreting insurance policies is unremarkable:

> The foremost principle is that an insurance policy is a contract.
> Parties are at liberty to contract for insurance to cover such risks as
> they see fit and they are bound by terms of the contract. It
> necessarily follows that courts are not at liberty to rewrite the terms
> of an insurance contract. The interpretation of the policy, with its
> exclusions, is a law question, unless the facts necessary to apply the
> decided law question are in dispute.
>
> When addressing a dispute concerning the language of an
> insurance policy, our first step is to determine as a matter of law
> whether the policy language at issue is ambiguous. If it is not
> ambiguous, we accept the language in its plain, ordinary and popular
> sense. We must construe the policy to give a reasonable effect to all
> of its provisions, construing liberally words of inclusion in favor of
> the insured and construing strictly words of exclusion against the
> insurer.

*Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 134 (Okla. Civ. App.

2005) (citations omitted) (summarizing Oklahoma Supreme Court caselaw).

"Insurance contracts are ambiguous only if they are susceptible to two

constructions." *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861,

869 (Okla. 1996). When a contract is ambiguous, extrinsic evidence is necessary

to resolve the ambiguity. *See Campbell v. Indep. Sch. Dist. No. 01 of Okmulgee*

*County*, 77 P.3d 1034, 1039 (Okla. 2003). In considering ambiguous insurance

contracts, courts "examine the policy language objectively to determine whether an insured could reasonably have expected coverage. . . . [A]mbiguities are construed most strongly against the insurer." *Max True*, 912 P.2d at 865.

The parties rely on several different provisions of the Great American policy. We address them in turn. Section I states:

> [Great American] will pay on behalf of [Yaffe] those sums in excess of the "Retained Limit" that [Yaffe] becomes legally obligated to pay by reason of liability imposed by law or assumed by [Yaffe] under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and is caused by an "occurrence" happening anywhere. The amount we will pay for damages is limited as described below in the Insuring Agreement Section II. LIMITS OF INSURANCE.

Great American policy § I. (Neither party suggests that the insured-contract language applies in this case.) Subsection II.G defines *Retained Limit*. It states:

> We will be liable only for that portion of damages, subject to the Each Occurrence Limit stated in the Declarations, in excess of the "[R]etained [L]imit," which is the greater of:
>
> 1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to [Yaffe] during the Policy Period; or
>
> 2. the amount stated in the Declarations as Self-Insured Retention as a result of any one "occurrence" not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other insurance providing coverage to [Yaffe] during the Policy Period;
>
> and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

> Once the Self-Insured Retention has been exhausted by actual payment of "claims" in full by [Yaffe], the Self-Insured Retention will not be reapplied or again payable by [Yaffe] for said Policy Period.

*Id.* § II.G. (The parties agree that the latter of the two alternatives in § II.G—self-insured retention—is irrelevant to this appeal.) The Schedule of Underlying Insurance lists a per-occurrence limit of $1,000,000 for the ACE policy.

Great American contends that these provisions mean that its "obligation to pay is limited to Yaffe's liability *in excess of* the limits of the underlying policy," Aplee. Br. at 17, and consequently, "Great American has no obligation to pay under its umbrella policy until the limits of the ACE Primary Policy have been exhausted," *id.* at 20. We disagree. The natural meaning of the above provisions, read together, is that the Great American policy provides coverage for liability of Yaffe above the Retained Limit of $1,000,000. Because Yaffe has "become[] legally obligated to pay" $1,785,986.89, Great American would be required to pay the amount in excess of $1,000,000, or $785,986.89. The policy defines the *Retained Limit* as the total of "amounts" that appear in the Schedule of Underlying Insurance. This schedule sets forth numbers representing policy limits of the underlying policies. If any other features of the underlying policies—such as the size of the deductible or whether the deductible is per-occurrence or per-claim—were relevant to computation of the Retained Limit,

-9-

certainly those features would be described in the schedule. But the schedule sets forth only that the ACE policy has a general aggregate limit of $2,000,000 and a per-occurrence limit of $1,000,000. Indeed, the underwriting file that Great American created in preparing the policy does not include a description of the nature of the deductible; it states only that the ACE policy had a $10,000 deductible, with no specification of whether it applied per claim or per occurrence.

In our view the language in § I (Coverage) and § II.G (Retained Limit) of the Great American policy implies that coverage begins once Yaffe has incurred liabilities exceeding $1,000,000. *Cf. U.S. Fire Ins. Co. v. Charter Fin. Group, Inc.*, 851 F.2d 957, 959 & n.6, 963 (7th Cir. 1988) (when excess policy defined "retained limit" as, in pertinent part, "the total of the applicable limits of the underlying policies listed" and underlying policy provided coverage of $100,000, court interprets excess policy as providing coverage for property damage beginning at $100,000 (internal quotation marks omitted)); *Fried v. N. River Ins. Co.*, 710 F.2d 1022, 1024, 1026–27 & n.6 (4th Cir. 1983) (when excess policy defined "retained limit" as "'the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other underlying insurance available to the insured,'" court interprets policy as providing coverage "above the threshold level of the face value of the Schedule A policies" and notes that "[t]o hold otherwise subjects the insurer to unforeseeable

and variable risks depending upon the underlying insurance actually maintained by any one of the potential insureds"). At oral argument Great American suggested that Yaffe's construction of these provisions would free Yaffe from the bargain it made (at least implicitly) with ACE—namely, that in exchange for a reduced premium on the ACE policy, Yaffe agreed that the deductible would apply per claim rather than per occurrence and thereby risked having a much larger deductible in some instances. But Yaffe's bargain with ACE should be irrelevant to the construction of the language of the Great American policy. And in any event, Yaffe has clearly paid, through the nose, for the bargain it made. Even under Yaffe's construction of the Great American policy, a cheaper insurance policy with ACE with a *per-claim* deductible has caused it to have to pay more than $500,000 in deductibles before Great American starts to pay.

The dissent argues that our reading of §§ I and II.G must be wrong because it renders irrelevant the actual coverage by the underlying policies. "[I]t would have been far simpler," says the dissent, "to establish a set deductible amount, rather than to establish that amount by reference to the applicable limits of the underlying insurance policies." Op. (Briscoe, J., dissenting) at 7. We are not persuaded. The policy definition of *Retained Limit* is the sum of the limits of all insurance policies providing coverage to Yaffe, not just the policies listed in the Schedule of Underlying Insurance. *See* § II.G. If the policy stated simply "a set deductible amount," the Retained Limit would not be automatically increased, as

it is under the present language, if Yaffe acquired additional underlying insurance.

The dissent also asserts that there would be no need for § VI.I of the policy, which requires Yaffe to maintain its underlying insurance, if Great American's coverage depends only on amounts set forth on the Schedule of Underlying Insurance. We note that Great American itself has made no such argument. On the contrary, its brief to this court chastises Yaffe for raising on appeal an argument based on § VI.I that it had not raised below. It continues: "Moreover, the argument is irrelevant as Yaffe did maintain underlying insurance, and ACE is paying claims pursuant to its primary policy." Aplee. Br. at 42. In any event, § VI.I serves a clear purpose even under our interpretation of *Retained Limit*. For one thing, the actual coverage provided by the ACE policy and the exhaustion of the limits of that policy affect Great American's duty (1) to defend Yaffe, *see* § III.A, discussed below, and (2) to make payments for appeal bonds, prejudgment interest, and costs, *see* § III.B.3 (regarding litigation expenses). Thus, § VI.I is not superfluous. Despite the dissent's arguments, we believe that the most reasonable reading of §§ I and II.G is that Great American is obligated to pay once Yaffe has incurred liabilities exceeding $1,000,000.

Other provisions in the Great American policy, however, are less clear than the above and provide at least some support for Great American's construction. Subsection VI.P of the policy, entitled "When Loss is Payable," sets independent

conditions on if (as well as when) Great American must pay. It states, in pertinent part:

> Coverage under this policy will not apply unless and until [*Yaffe*] *or* [*Yaffe's*] *underlying insurer* is obligated to pay the "[R]etained [L]imit."

Great American policy § VI.P (emphasis added). Initially it may appear that the plain meaning of the provision is that coverage under the policy begins when *either* Yaffe *or* ACE is obligated to pay $1,000,000. When the Coverage provision of the policy speaks of "sums . . . that [Yaffe] becomes legally obligated to pay by reason of liability imposed by law," *id.* § I, it is undoubtedly including sums paid by underlying insurance coverage. Thus, when § VI.P refers to what Yaffe "is obligated to pay," it must be referring to Yaffe's legal liability, regardless of whether Yaffe is protected by insurance coverage for that liability. Because Yaffe has been obligated to pay more than $1,000,000 as the result of the Muskogee explosion, there would seem to be coverage under the Great American policy. But this construction of the provision renders the words "or [Yaffe's] underlying insurer" superfluous because Yaffe's underlying insurer, whose obligation derives from Yaffe's, would be obligated to pay only when Yaffe itself would be obligated.

A possible alternative reading of § VI.P that avoids rendering the reference to Yaffe's insurer as surplusage would be based on the recognition that umbrella coverage protects against identified gaps in underlying policies. "Umbrella

policies differ from standard excess policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)." *Commercial Union Ins. Co.*, 7 F.3d at 1053. It may be, therefore, that § VI.P should be read to say that coverage under the Great American policy applies only when *either* Yaffe (in the case of an event not covered by other insurance) *or* Yaffe's underlying insurer (in the case of an event covered by other insurance) is obligated to pay the Retained Limit. Because the Muskogee explosion is undoubtedly covered by the ACE policy, § VI.P would then mean that Great American's obligation is triggered only after ACE has become obligated to pay $1,000,000—that is, only after the ACE coverage has been exhausted.

A third reading, which arrives at the same conclusion, is proffered by Great American and was adopted by the district court. Under that reading the purpose and effect of the reference to Yaffe's obligation in § VI.P is merely to protect Yaffe in the event of default by its primary insurer, ACE. If ACE, because of insolvency or unjustified refusal to pay, does not pay its obligations and Yaffe is forced to pay covered liabilities itself, Great American would count such payments under § VI.P. This third reading avoids the surplusage problem with the first reading, but neither Great American nor the district court has explained how it derived this meaning from the language of the policy.

Subsection VI.J, entitled "Other Insurance," sets a further condition on payment by Great American. It, too, is subject to more than one reasonable construction. It states:

> If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions, and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

Great American policy § VI.J. The phrase "excess of the other insurance" is not defined in the policy. There is support for Great American's view that the phrase means that the policy applies only "after the primary coverage limits have been exhausted." *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001) ("*Primary insurance* provides immediate coverage for the insured upon the occurrence of a loss or the happening of an event which, under the terms of the policy, gives rise to immediate liability. . . . An *excess insurance policy* is one which by its terms provides coverage that is secondary to the primary coverage; there is usually no obligation to the insured until after the primary coverage limits have been exhausted.").

But a general description of insurance policies, such as that in *U.S. Fidelity & Guaranty Co.*, must yield to the specific language of a particular policy. Oklahoma law imposes coverage when "an insured could reasonably have expected coverage" based on the policy language, *Max True*, 912 P.2d at 865;

and to a reasonable person looking only at this language, the phrase "excess of the other insurance" could well mean "to the extent that the other insurance is not required to pay (even if the other insurance applies to the loss)." Under this reading, § VI.J would come into play to limit Great American's duty to pay only when both the Great American policy and another policy (in this case, the ACE policy) require payment. This could happen if, for example, a new $50,000 claim arising out of the explosion were added to the claims against Yaffe. Because of the $10,000 per-claim deductible in the ACE policy, ACE would be obligated to pay $40,000. Because under Yaffe's construction of the policy the Great American deductible had been exceeded, Great American would be obligated for the entire $50,000. Great American would be the only insurer obligated to pay the first $10,000, so it would owe that sum. As to the remaining $40,000, both Great American and ACE would be liable, so § VI.J would presumably impose the obligation on ACE. *See* Lee R. Russ, Couch on Insurance § 219:1 (3d ed. 2007) ("'Other insurance' clauses govern the relationship between insurers[;] they do not affect the right of the insured to recover under each concurrent policy.").

Finally, both parties claim to find support for their positions in § III.A of the Great American policy, entitled "Defense." (Yaffe has not claimed, however, that Great American actually had any obligation to defend it against any of the claims arising out of the explosion). It provides:

[Great American] will have the right and duty to investigate any "claim" and defend any "suit" seeking damages covered by the terms and conditions of this policy when:

1.      the applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other insurance providing coverage to [Yaffe] have been exhausted by actual payment of "claims" for any "occurrence" to which this policy applies; or

2.      damages are sought for any "occurrence" which is covered by this policy but not covered by any underlying policies listed in the Schedule of Underlying Insurance or any other insurance providing coverage to [Yaffe].

Great American policy § III.A. Both parties seem to agree that this provision requires (and permits) Great American to investigate and defend a claim when the limits of ACE's coverage have been exhausted. It would seem peculiar, however, for the policy to require payment by Great American before Great American's right and duty to investigate and defend arises. Great American should not be required to pay on a claim against Yaffe without having the opportunity to protect its interests by investigating and defending the claim. Yet that could be the case under Yaffe's interpretation of the policy because the duty to pay could arise before exhaustion of ACE's coverage, which is what triggers the right and duty to investigate and defend. One could thus infer that the duty to pay must not arise until the § III.A rights and duties arise—namely, upon exhaustion of the ACE coverage.

-17-

But Yaffe has a reasonable contrary argument. It argues that the language of § III.A shows that the drafters of the policy could require "exhaustion" of coverage when they wanted to. It contends that this section "shows precisely how unambiguous language can and should provide for a requirement that underlying insurance be 'exhausted.'" Aplt. Br. at 27. The failure to use such language in §§ I and II.G, it contends, therefore shows that the Retained Limit could be exceeded before exhaustion of the underlying coverage. In our view § III.A does not unambiguously indicate whether Great American's obligation to pay begins only when the ACE policy's limits have been exhausted.

In sum, we believe that the Great American policy is susceptible to more than one reasonable construction; it is not unambiguous. Summary judgment in favor of Great American on this ground was therefore improper. Furthermore, Great American does not argue on appeal that it would be entitled to summary judgment even if the policy were ambiguous, so we do not address such a possibility and instead conclude that the grant of summary judgment to Great American must be reversed.

In light of the above discussion, we also must conclude that the district court's ground for denying Yaffe's motion for summary judgment—namely, that the Great American policy unambiguously indicated that Great American had no obligation to pay until the ACE policy was exhausted—was erroneous. This does not mean, however, that Yaffe is now entitled to summary judgment. All we have

decided is that the Great American policy is ambiguous.  Yaffe would have us take the next step.  It contends that it is entitled to summary judgment because (1) any ambiguity in the policy must be construed against the drafter of the policy, Great American, and in favor of coverage; and (2) it had a reasonable expectation that the policy would provide coverage.  But at this stage of the proceeding we must disagree.  Great American had no opportunity to respond to Yaffe's summary-judgment motion, and entry of summary judgment against it would therefore be improper.

"Federal Rule of Civil Procedure 56 implicitly requires the district court to allow the nonmoving party an opportunity to respond before summary judgment is entered against it." *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1163 (10th Cir. 1998).  But the district court granted Great American's motion for summary judgment one week after Yaffe filed its motion for summary judgment, well before Great American's response was due.  In its response Great American may have pointed to extrinsic evidence that resolved any ambiguity in the policy and would have defeated Yaffe's motion.  Given the district court's grounds for its ruling on the merits, proceeding to deny Yaffe's motion was hardly improper.  Now that we have reversed that ruling, however, Great American is entitled to an opportunity to respond to Yaffe's motion.  Accordingly, we must remand for further proceedings. *Cf. Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 (10th Cir. 2003) (district court abused its discretion in granting summary

judgment when it relied on new materials in reply brief without giving the nonmovant an opportunity to file a surreply; because appellate court was reversing summary judgment for other reasons, "[a]ny prejudice flowing from [appellant's] inability to reply to this material may be corrected on remand").

## C. Motion to Compel Discovery

As an alternative to its argument that it be granted summary judgment, Yaffe argues for reversal of the district court's denial of its motion to compel discovery. The district court denied the motion to compel on the ground that the Great American policy was unambiguous. Because we have determined that the relevant terms of the policy are ambiguous, we remand this issue to the district court for reconsideration.

## III. CONCLUSION

We REVERSE the district court's grant of summary judgment to Great American and REMAND for further proceedings.

No. 06-7057, The Yaffe Companies, Inc. v. Great American Insurance Company

**BRISCOE,** Circuit Judge, dissenting:

I respectfully dissent. Although the majority concludes "that the district court's ground for denying Yaffe's motion for summary judgment–namely, that the Great American policy unambiguously indicated that Great American had no obligation to pay until the ACE policy was exhausted–was erroneous," Maj. Op. at 18, in my view it is the majority's own conclusion that is erroneous.

I.

Before detailing my differences with the majority's decision, I believe it is useful to briefly revisit the relevant facts of this case and, consistent with our obligation under Oklahoma law to construe the policy as a whole, to review all of the relevant Great American policy provisions together. See Bituminous Cas. Corp. v. Cowen Constr., Inc., 55 P.3d 1030, 1033 (Okla. 2002) (holding that an insurance policy must "'be construed according to the entirety of its terms and conditions set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application attached to and made a part of the policy.'") (quoting Okla. Stat. tit. 36, § 3621).

Effective October 1, 2004, Great American issued to Yaffe, in exchange for a premium of $272,310, a "Commercial Umbrella" policy with a policy period of October 1, 2004, to October 1, 2005. App. at 74, 86. The Great American policy provided total coverage of $25,000,000 for "[e]ach [o]ccurrence" and in the

aggregate.  Id. at 86.  The "INSURING AGREEMENTS" portion of the Great

American policy provided, in pertinent part, as follows:

### I.  COVERAGE

We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" that the "Insured" becomes legally obligated to pay by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of "bodily injury," "property damage," "personal injury," or "advertising injury" that takes place during the Policy Period and is caused by an "occurrence" happening anywhere.  The amount we will pay for damages is limited as described below in the Insurance Agreement Section II. LIMITS OF INSURANCE.

### II.  LIMITS OF INSURANCE

* * *

### G.  Retained Limit

 We will be liable only for that portion of damages . . . in excess of the "retained limit," which is the greater of:

> 1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the "Insured" during the Policy Period; or
>
> 2. the amount stated in the Declarations as Self-Insured Retention [which in this case was "$ -0-"] as a result of any one "occurrence" not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other insurance providing coverage to the "Insured" during the Policy Period;
>
> and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations [i.e., $25,000,000].

App. at 88-89 (emphasis added).

The Great American policy's "Schedule of Underlying Insurance," which is referenced in the policy's definition of "Retained Limit," listed three different policies, including "ACE AMERICAN POLICY: D35980490" (Ace American policy) which provided commercial general liability and employee benefit liability to Yaffe for the policy period of October 1, 2004, to October 1, 2005. Id. at 76. The Schedule of Underlying Insurance stated that the Ace American policy, to the extent it provided commercial general liability coverage, had a $2,000,000 general aggregate limit and a $1,000,000 "each occurrence" limit. Id.

Finally, the Great American policy contained the following three (I, J and P) relevant "CONDITIONS" provisions (which are found in § VI):

**I. Maintenance of Underlying Insurance**

During the period of this policy, you agree:

> 1. to keep the policies listed in the Schedule of Underlying Insurance in full force and effect;
>
> 2. that any renewals or replacements of the policies listed in the Schedule of Underlying Insurance will not be more restrictive in coverage;
>
> 3. that the Limits of Insurance of the policies listed in the Schedule of Underlying Insurance will be maintained except for any reduction or exhaustion of aggregate limits by payment of "claims" or "suits" for "occurrences" covered by "underlying insurance"; and

4. that the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not change during the period of this policy such as to increase the coverage afforded under the policy.

If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.

**J. Other Insurance**

If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

\* \* \*

**P. When Loss Is Payable**

Coverage under this policy will not apply unless and until any "Insured" or an "Insured's" underlying insurer is obligated to pay the "retained limit."

When the amount of loss has finally been determined, we will promptly pay on behalf of the "Insured" the amount of loss falling within the terms of this policy.

Id. at 99-100.

On December 28, 2004, an explosion occurred at Yaffe's scrap yard in Muskogee, Oklahoma. Id. at 47. According to Yaffe, it incurred approximately $1,785,986.89 in total liabilities as a result of various claims resulting from the explosion. Id. Because, however, a majority of those claims were for amounts less than the $10,000 per-claim deductible set forth in the Ace American Policy,

Ace American provided no coverage for those claims, leaving Yaffe responsible to pay $1,287,987.79 worth of claims. Id. at 47-48. In other words, Ace American, to date, has paid only $497,999.10 of the total liabilities incurred by Yaffe as a result of the explosion, leaving over half-a-million dollars remaining under the $1,000,000 "per occurrence" limit set forth in the Ace American Policy. Id. at 48.

Yaffe filed suit against Great American in the District Court of Muskogee County, Oklahoma. Yaffe's complaint alleged that Great American had breached its contract of insurance by failing to reimburse Yaffe for its deductible obligations, and also sought a declaration that Great American would be obligated to reimburse Yaffe "for all amounts not covered by Yaffe's underlying policy [the Ace American policy], including all deductible payments incurred by Yaffe." Id. at 14-17. Alternatively, Yaffe sought a declaration that Great American was liable for all of Yaffe's liabilities resulting from the accident that exceeded $1,000,000, regardless of who paid the first $1,000,000 in claims. Great American filed an answer, timely removed the action to federal district court, and then filed a counterclaim seeking a declaration that it had no duty to pay under its umbrella policy until and unless the limits of the Ace American primary policy had been paid. The parties subsequently filed cross-motions for summary judgment. The district court issued an opinion and order granting Great

American's motion for summary judgment and denying Yaffe's cross-motion for summary judgment.

II.

Turning to the majority's decision, it is first suggested that "the language in § I (Coverage) and § II.G (Retained Limit) of the Great American policy implies that coverage begins once Yaffe has incurred liabilities exceeding $1,000,000." Maj. Op. at 10. With this statement, the majority focuses on the phrase "total amounts," as employed in § II.G, and omits the introductory requirement that limits Great American's liability to only "that portion of damages . . . in excess of the 'retained limit.'" The majority then interprets the "total amounts" phrase to simply refer to a mathematic total equivalent to the applicable limits of any underlying policies maintained by the insured, in this case $1,000,000, omitting any requirement that these limits must be paid by the underlying policy insurer(s). In other words, the majority concludes that the sole purpose of § II.G's reference to the "the applicable limits of the underlying policies" is to establish a threshold dollar amount, above which coverage under the umbrella policy will begin, and regardless of whether Yaffe or the underlying insurer(s) paid or were liable for the amounts below the threshold dollar amount.

In my view, this is a misreading of the policy. To begin with, it omits the key introductory language of § II.G that states Great American "will be liable only for that portion . . . in excess of the 'retained limit,' which is the greater of"

-6-

(1) "the total amount stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance" (i.e., the Ace American policy, which had a per occurrence limit of $1,000,000) "and the applicable limits of any other insurance providing coverage to the 'Insured' during the policy period" (there were no such other policies in place in this case), or (2) "the amount stated in the Declarations as Self-Insured Retention" (i.e., zero). Although § II.G could perhaps be more clear, its reference to "the applicable limits of the underlying policies" was obviously intended, particularly when considered in light of the other relevant policy provisions, to mean that those limits have to be exhausted before coverage begins under the Great American policy. To conclude otherwise, as the majority does, effectively transforms the policy from its intended purpose as an excess policy into a primary insurance policy with a large deductible. If that is the proper interpretation, then one must ask why the policy repeatedly refers to the underlying policies and their applicable limits, and why the policy requires that those underlying policies be kept in full force and effect? If the majority's interpretation were correct, there would be no need to refer at all to any underlying policies and their applicable limits. Stated differently, it would have been far simpler for the policy to establish a set deductible amount, rather than to establish that amount by reference to the applicable limits of the underlying insurance policies maintained by Yaffe. Notably, the majority concedes that the purpose of § II.G's reference to underlying policies maintained

-7-

by the insured is to ensure that the Retained Limit will be "automatically increased" in the event that the insured "acquire[s] additional underlying insurance." Maj. Op. at 11-12. But this concession, with which I agree, makes sense only if the Great American policy is interpreted as providing excess, rather than primary, coverage.

The majority further errs in construing § VI.J ("Other Insurance") of the policy, which states: "If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance." Although the majority acknowledges, as it must, that this language can reasonably be construed to "mean[] that the policy applies only after the primary coverage limits have been exhausted," Maj. Op. at 15 (internal quotation marks omitted), it suggests that "to a reasonable person . . . the phrase 'excess of the other insurance' could well mean 'to the extent that the other insurance is not required to pay (even if the other insurance applies to the loss).'" Id. at 16. In my view, the plain language of § VI.J has only one reasonable interpretation and that interpretation clearly refutes the majority's proposed alternative reading. Specifically, a reasonable insured in the position of Yaffe could only have read § VI.J to mean that the Great American policy would provide coverage for a loss only after the limits of any applicable underlying policies were exhausted.

The majority also reads too much into § VI.P of the Great American policy. That section, entitled "When Loss is Payable" and contained in the "Conditions"

section of the policy, provides, in pertinent part, that "[c]overage under this policy will not apply unless and until any 'Insured' or an 'Insured's' underlying insurer is obligated to pay the 'retained limit.'" App. at 100. Although the majority speculates on the possible meanings of this provision and its impact on coverage, the fact is that § VI.P does not purport to modify or otherwise impact the coverage provisions of the policy. Indeed, the second paragraph of § VI.P confirms that the point of the subsection (as indicated by its title) is to specify "when," not "how much," Great American is obligated to pay: "When the amount of loss has finally been determined, we will promptly pay on behalf of the 'Insured' the amount of loss falling within the terms of this policy."

Further, the majority all but overlooks § VI.I of the Great American policy.[1] That section, entitled "Maintenance of Underlying Insurance," required Yaffe to keep the underlying policies listed in the schedule of insurance "in full force and effect" and to maintain the same coverage restrictions, limits, and terms and conditions during the life of the umbrella policy. Id. at 99. If, as the majority effectively concludes, the policy's "retained limit" is nothing more than a mathematical liability amount that must be reached before coverage begins, then why would it have been necessary for Yaffe to maintain any underlying policies

---

[1] The majority complains that "Great American itself" has not expressly relied on § VI.I to supports its position. Maj. Op. at 12. That complaint, however, carries no weight in light of our obligation under Oklahoma law to construe the policy "according to the entirety of its terms and conditions . . . ." Bituminous Cas. Corp., 55 P.3d at 1033 (internal quotation marks omitted).

during the life of the Great American policy? The only answer the majority can muster is that "the actual coverage provided by the ACE policy and the exhaustion of the limits of that policy affect Great American's duty (1) to defend Yaffe," "and (2) to make payments for appeal bonds, prejudgment interest, and costs . . . ." Maj. Op. at 12. Again, however, this is a grossly distorted, and unnecessarily limited, reading of the policy language. In fact, the clear and undeniable purpose of § VI.I's maintenance of underlying insurance requirement, consistent with the Great American policy as a whole, was to ensure that the policy operated as intended, i.e., as an excess liability policy that provided coverage only after exhaustion of the applicable limits of the underlying primary policies maintained by Yaffe.

Finally, the majority effectively ignores the fact that the liability incurred by Yaffe in this case resulted from the existence of multiple claims, and thus the application of multiple corresponding deductibles, under the Ace American policy. Although the majority suggests that the Great American policy can be reasonably construed to operate as an excess policy to fill gaps in the underlying insurance, it is clear that the deductible amounts that Yaffe was required to pay under the Ace American policy cannot reasonably be considered "gaps" in that policy. Rather, deductibles, "which [are] frequently referred to as self-insurance," function "to alter the point at which an insurance company's obligation to pay will ripen." Int'l Bankers Ins. Co. v. Arnone, 552 So.2d 908,

-10-

911 (Fla. 1989); see Beech Aircraft Corp. v. United States, 797 F.2d 920, 922 (10th Cir. 1986) ("If one having an insurable risk retains the risk of his own loss, there is no risk transfer, and the arrangement is self-insurance."). In other words, Yaffe, by agreeing to the unusual deductible scheme set forth in the Ace American policy, chose (presumably in return for a lower premium on that policy) to accept the risk that it would be required to self-insure in the event of multiple claims arising out of an occurrence. As the district court correctly noted, "it is generally understood that 'an excess insurer does not reimburse the insured for the amount of the primary policy deductible,'" App. at 511 (quoting Couch on Insurance, (3d Ed.), § 220:36), and that "[t]he rationale for not including deductible payments as part of the limits of the underlying policy [wa]s grounded in the insured's decision to, in essence, become self-insured for the deductible amount as a result of the bargain reached with the primary insurer . . . ." Id. at 511; see also Douglas R. Richmond, Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance, 22 Pepp. L. Rev. 1373, 1399 (1995) ("The purpose of excess coverage or an umbrella policy is to protect the insured in the event of catastrophic losses in which liability exceeds available primary coverage. Excess and umbrella policies are intended to expand the amount, but not the scope of coverage. Therefore, only after the underlying primary policy has been exhausted will any umbrella policies kick in.") (internal quotation marks omitted).

Considering the Great American policy as a whole, I agree with the district court that the policy cannot reasonably be construed to provide coverage for the circumstances alleged in Yaffe's complaint. Therefore, I agree with the district court that Great American was entitled to summary judgment in its favor, and I would affirm the judgment of the district court.