Tammy HOWELL, a minor, by her guardian ad litem, Charles GOERDT, Plaintiff–Appellant,

v.

TRIBUNE ENTERTAINMENT COMPANY and ABC Insurance Company, Defendants–Appellees.

No. 96–2666.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1997.

Decided Feb. 5, 1997.

William P. Skemp (argued), Charles Goerdt, La Crosse, WI, for plaintiff–appellant.

Frank M. Tuerkheimer (argued), Robert Dreps, Melanie E. Cohen, LaFollette & Sinykin, Madison, WI, Charles J. Sennet, Tribune Co. Chicago, IL, for defendants–appellees.

Before POSNER, Chief Judge, and COFFEY and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

This is a diversity suit, governed by Wisconsin law, mainly complaining of an invasion of the right of privacy by publicizing facts about the plaintiff's private life. Wis. Stat. § 895.50(2)(c). But we must begin our consideration with an issue of jurisdiction not remarked by the district judge or the parties. The plaintiff, Tammy Howell, is a citizen of Wisconsin. There are two defendants. One, Tribune Entertainment Company, is a corporate citizen of Delaware and (at the time the suit was filed, which is the relevant time) of Illinois. The other, the ABC Insurance Company, is of unknown citizenship. The complaint alleges that "jurisdiction in this Court [the district court] is founded upon diversity of citizenship," and properly indicates the citizenship of the plaintiff and of the defendant Tribune. There is no further mention of ABC in any of the papers in the case except a brief reference in Tribune's appellate brief to ABC as an "unidentified insurance company" that had been named as a defendant. ABC disappeared from the caption (we have restored it), but there is no order dismissing it from the case. At argument, neither lawyer was able to give us any information about ABC, including which state or states it is a citizen of. Howell's lawyer believes that ABC is Tribune's liability insurer. Wisconsin is a direct-action state, Wis. Stat. § 803.04(2), making it possible to name the defendant's insurer as an additional defendant in a tort suit.

For almost two centuries the diversity statute has been interpreted to require "complete" diversity of citizenship (meaning that none of the parties on either side of the litigation may be a citizen of a state of which a party on the other side is a citizen). *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Caterpillar Inc. v. Lewis*, —— U.S. ——, ——, 117 S.Ct. 467, 472, 136 L.Ed.2d 437 (1996); *Fidelity & Deposit Co. v. City of Sheboygan Falls*, 713 F.2d 1261, 1264 (7th Cir.1983). The only excuse that Howell's lawyer offered for having named ABC as a defendant without ascertaining whether naming it would destroy complete diversity is that he had been unable to find out anything about ABC. We can imagine a case in which, with the statute of limitations about to run out (not a problem here), the plaintiff is unable with all due diligence to ascertain the state or states of citizenship of a potential defendant. In such a case he can proceed without that defendant and add it later (with relation back, to the extent permitted by Fed.R.Civ.P. 15(c)(3), to the date of filing of the original complaint), when the necessary information is obtained. At argument, Tribune chimed in with the suggestion that since ABC was (naturally) never served, it never became a defendant. But in the federal judicial system a party becomes a defendant not when he is served but when the complaint naming him is filed. That is when the suit against the defendant is commenced. Fed.R.Civ.P. 3. Service is not due until 120 days later, and the time can be extended. See Fed.R.Civ.P. 4(m). This rule authorizes the district court to dismiss the defendant from the suit if service is not

accomplished within the 120 days, and it wasn't accomplished within that time here; nor was any extension of the deadline for service sought or granted. Still, the court didn't, in fact, dismiss the unserved defendant; and the rule does not bring about an automatic dismissal, without judicial action.

■ States often allow a plaintiff to name an unknown party as an additional defendant. E.g., Wis. Stat. § 807.12; Carol M. Rice, "Meet John Doe: It Is Time for Federal Civil Procedure to Recognize John Doe Parties," 57 *U. Pitt.L.Rev.* 883, 892 n. 27 (1996). For that matter, so does federal law in a suit based on the federal question jurisdiction, see, e.g., *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which does not depend on the parties' addresses. But because the existence of diversity jurisdiction cannot be determined without knowledge of every defendant's place of citizenship, "John Doe" defendants are not permitted in federal diversity suits. *Moore v. General Motors Pension Plans,* 91 F.3d 848, 850 (7th Cir.1996) (per curiam); *United States Fire Ins. Co. v. Charter Financial Group, Inc.,* 851 F.2d 957, 958 n. 3 (7th Cir. 1988); 14 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3642, pp. 144–46 (2d ed.1985).

■ To this as to most legal generalizations there are exceptions. The obvious one, inapplicable to this case however, is if the "John Does" are merely nominal parties, irrelevant to diversity jurisdiction. *Moore v. General Motors Pension Plans, supra,* 91 F.3d at 850; *United States Fire Ins. Co. v. Charter Financial Group, Inc., supra,* 851 F.2d at 958 n. 3. And naming a John Doe defendant will not defeat the named defendants' right to remove a diversity case if their citizenship is diverse from that of the plaintiffs. 28 U.S.C. § 1441(a). That exception is also inapplicable to this case, which was not removed. *Salzstein v. Bekins Van Lines, Inc.,* 747 F.Supp. 1281, 1283 (N.D.Ill. 1990). A quasi-exception, also inapplicable, is that the domicile of a fugitive defendant will be taken to be his domicile before he fled, *Lloyd v. Loeffler,* 694 F.2d 489, 490 (7th Cir.1982), to discourage defendants from trying to defeat federal jurisdiction by such a tactic. So none of the exceptions applies here, and the plaintiff doesn't even have the excuse (not justification) of not knowing the defendant's name. It should not be difficult to determine an insurance company's state or states of citizenship.

■ *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), authorizes us, however, to restore complete diversity, even when the case is on appeal and diversity was incomplete in the district court, by dropping a party whose presence is unnecessary to the proper resolution of the controversy. That describes ABC Insurance Company to a T. It is not a nominal party, but its only role in the case is as a kind of guarantor of the defendant insured's ability to pay a judgment; and as no one doubts the ability of the Tribune Entertainment Company, a part of the *Chicago Tribune's* media empire, to pay any damages judgment that Tammy Howell would be likely to obtain, the insurance company is superfluous. At argument we asked Howell's lawyer whether he would prefer us to dismiss ABC or dismiss the suit. He replied that he would prefer us to dismiss ABC and we hereby do so and proceed to the merits. Since no one wants to retain ABC in the case, there is no need to consider whether to remand for a determination of its citizenship as in *Singletary v. Continental Ill. Nat'l Bank,* 9 F.3d 1236, 1238 (7th Cir.1993).

Tammy Howell, the plaintiff, was a 16–year–old schoolgirl living in LaCrosse, Wisconsin when she learned that the Charles Perez Show, a television talk show produced by the defendant and broadcast nationwide, was planning to tape a show about how ever since Cinderella's day stepparents and their stepchildren have had trouble getting along. The show broadcast a call for participants. Tammy, her older sister, their stepmother, Karen Hoeppner, and Karen's daughter volunteered. After being interviewed by a member of the show's staff, the four of them flew to New York for a taping in front of a live studio audience. Although the suit was dismissed on the pleadings, a copy of the tape is in the appellate record and Tammy's lawyer urged us to watch it, which we have

done. It opens with three of the four women sitting side by side: Tammy, a visibly pregnant quiet blonde girl at one end of the row (seven months pregnant, not married or, so far as appears, intending marriage to the father), the stepmother at the other end, and Tammy's very loquacious twenty-year-old sister in the middle. (Karen's daughter was offstage at the beginning.) The sister opens up by accusing the stepmother—married to the sister's father for only six months—of having begun an affair with him before his divorce from his wife, her mother, the critical evidence being a 2 a.m. phone call from the now-stepmother to the father before the divorce. (Murmurs of disapproval from the very active studio audience.) The stepmother denies this, adding that the wife had filed for divorce five times and enigmatically relating the phone call to this conduct. The sister keeps accusing the stepmother of adultery (a felony, be it noted, in Wisconsin, Wis. Stat. § 944.16(2)), with Tammy adding supportive remarks from time to time. The stepmother pulls a sheet of paper from her pocket and starts to read, and Tammy asks whether it's her school attendance record. It isn't. It's a police report, the stepmother explains to the oohs and aahs of the increasingly vocal studio audience, and she reads a portion of it: Tammy "has been engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud behavior. She has threatened or hit others. She has referred to herself as the biggest gangster ___ in town." (The word we have left blank, apparently an obscenity expunged by the producer, cannot be understood.) Tammy rises, smirks, does a 360 degree turn, displaying her pregnant state, and asks rhetorically, "Do I look like a gangster ___ ?"

Now the stepmother's own daughter enters dramatically, to lend her mother support against the two stepdaughters. Accusations are traded back and forth for a while; then the subject changes to Tammy's pregnancy. It emerges that the father of her fetus is black, and host Perez raises the question whether the stepmother's tensions with Tammy may have something to do with race. Indignant denials. The stepmother's daughter announces that her own boyfriend is black. The panelists vie to outdo each other in proclaiming their delight in "colored babies." Black members of the studio audience protest the term and there is a further round of denials of racial animus. End of segment. We add, to avoid any misimpression created by our summary, that the exchanges among the antagonists, while unfriendly, do not appear to reflect any deep animosity. The record is silent on whether the women were paid to participate in the show, although the sisters mention the financial straits in which Tammy's pregnancy has placed her, supplying a financial motive for a paid television appearance.

The program had been taped, as we said, and the tape was not broadcast for another two weeks. During this time Tammy did not ask that it be withdrawn or that the portion of the program to which she now objects— the disclosure of the contents of the police report—be deleted. After the program was broadcast, however, Tammy's life at school became unbearable (according to allegations of the complaint that we must accept as true for purposes of the appeal) because of teasing by other kids, and eventually she had to change schools. She seeks damages for the humiliation and mental anguish inflicted by the publicity that the broadcast gave to the contents of the police report.

Wisconsin law limits the disclosure of police reports about juveniles. Wis. Stat. § 48.396(1). Whether the prohibition was violated here may be doubted; the stepmother appears to have obtained a copy of the report in accordance with the statute, see Wis. Stat. § 48.396(1b), and furthermore it is unclear whether disclosure by a private individual, as distinct from the government, is covered. But even if there was no violation of the disclosure statute, there may have been a violation of Wisconsin's privacy law. Tammy argues that either Perez should have interrupted the program when he realized that the stepmother was reading from a police report or the defendant should have erased that part of the tape before the broadcast.

The district court on the defendant's motion dismissed the suit for failure to state a claim, and ordinarily this mode of disposi-

tion would confine the appellate record to the complaint. But as we said the plaintiff's lawyer invited us to watch the tape as well, just as if it had been appended to the complaint. A document appended to a complaint is treated as a part of the complaint in deciding whether the facts alleged state a claim. Fed.R.Civ.P. 10(c); *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir.1992); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994); cf. *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.1988). That is how we'll treat the tape.

In defending the judgment the defendant lays particular stress on the fact that the accusations in the police report do not concern really private facts. They amount to calling Tammy a rowdy and a brat. Not only is this pretty tame stuff by contemporary standards of adolescent decorum, but it is remote (the defendant argues) from the concerns of the privacy tort, as distinct from the tort of defamation. It is not a bringing to light of shameful private facts, involving nudity, sex, or serious but hidden physical or psychiatric problems, and so it is not the sort of disclosure that is "highly offensive" to the average person. *Zinda v. Louisiana Pac. Corp.*, 149 Wis.2d 913, 440 N.W.2d 548, 555 (1989); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229–35 (7th Cir.1993); *Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1353 (7th Cir.1995); *Restatement (Second) of Torts* § 652D(a) (1977). This may be too narrow a conception of Wisconsin's law of privacy; *Zinda* found a prima facie violation in the publicizing of the fact that the plaintiff had been fired from his job for falsifying his employment records. We need not decide how private a private fact must be for publicizing it to violate Wisconsin privacy law. The complaint is not that the stepmother called Tammy names but that the fact of Tammy's having drawn the attention of the police to her conduct—having acquired as it were a "police record"—has been publicized.

■ When the law seeks to draw a veil over an individual's past encounters with the law in order to facilitate the individual's reintegration into respectable society, *State ex rel. Herget v. Circuit Court*, 84 Wis.2d 435, 267 N.W.2d 309, 316 (1978), the privacy tort may subject one who raises the veil to sanctions. This principle, which originated in the famous though much criticized "Red Kimono" case, *Melvin v. Reid*, 112 Cal.App. 285, 297 P. 91 (1931), is subject to a variety of limitations, including the privilege of the media to disseminate information in which there is a legitimate public interest. *Haynes v. Alfred A. Knopf, Inc., supra*, 8 F.3d at 1231–32. Whether the privilege is applicable here, when it was no part of the defendant's purpose to bring to light Tammy's police record, or whether the principle of *Melvin v. Reid* applies even prima facie to so tepid a police record as Tammy has thus far compiled, we need not decide. Even if publicizing the police report was a prima facie invasion of rights that Tammy enjoyed by virtue of Wisconsin's tort law of privacy, her suit must fail.

Just as a lawyer who extracts inadmissible testimony from a witness cannot object when the opposing lawyer seeks to explore the evidentiary vein thereby exposed by asking further questions of the witness that would otherwise have been objectionable, see, e.g., *Rizzo v. Corning Inc.*, 105 F.3d 338, 341 (7th Cir.1997); *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir.1993); *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir.1985), so a person whose character is assailed can respond with facts bearing on the character of her assailant that might otherwise be off limits. *Lee v. Calhoun*, 948 F.2d 1162, 1166 (10th Cir.1991) (privacy); *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 258 N.W.2d 712, 715–16 (1977) (defamation); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1559 (4th Cir.1994) (same); *Richmond v. Southwire Co.*, 980 F.2d 518, 520 (8th Cir.1992) (per curiam) (same). Tammy joined her sister in accusing the stepmother of adultery as well as of mistreatment of her stepdaughters. The stepmother denied the accusations. Whom to believe? Information about Tammy's character was highly relevant to that issue, and some of it was contained in the police report and derived additional credibility from that source. Tammy may not hide behind Wisconsin's privacy law and from that shelter pelt her stepmother with defamatory accusations with impunity. Such a

privilege would distort the terms of public debate by giving an unjustified advantage to the juvenile contestant.

This analysis assumes that Tammy was old enough to waive rights she may have had under the tort law of privacy. She was a minor, and while she seems on the videotape to be sufficiently mature to be capable of realizing that by attacking her stepmother on national television she would be exposing any skeletons in her own closet to a public airing, we cannot make a confident judgment of her maturity from a few minutes of videotape, especially when most of the talking was done by others. The very detailed complaint, however, contains no hint that she was somehow inveigled by the defendant into traveling to New York to appear on this television show with no conception of the stakes. She was not so young as to be incapable of realizing that she would be in a glass house throwing stones. We need not decide at what age a child is sufficiently mature to waive her right of privacy, but 16 is old enough when no circumstances of deception or over-reaching or limited competence are shown.

■ The stepmother is not the defendant, however. So the fact that she had a right to use the police report in her defense does not automatically entitle the Tribune Entertainment Company to broadcast the report to millions. But if Tammy can broadcast her own accusations to millions, she should not be able to block her stepmother from broadcasting a reply to those accusations to the same audience. To prevent the audience from obtaining a one-sided view of the quarrel, the producer must be allowed to assert the stepmother's privilege. *Restatement, supra*, § 595; cf. *Hett v. Ploetz*, 20 Wis.2d 55, 121 N.W.2d 270, 272–73 (1963); *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171–72 (7th Cir.1993).

■ And it was not the producer that dragged Tammy's police record into the glare of the klieg lights; it was a nonparty, the stepmother. It is one thing to impose liability on the press for invading someone's privacy, and another to impose liability on it for failing to prevent or take steps to rectify an invasion of privacy by another. No one

suggests that the pre-program interview by the defendant's staff discovered the stepmother's intention of disclosing the police report; no doubt she kept that piece of rebuttal very much to herself. Of course when a television program invites quarreling family members to state their respective cases before an audience of millions, most anything can happen. But there is no principle in the law that by staging an event at which one person is likely to defame or invade the privacy of the other, the media become complicit in the defamation or the invasion of privacy. No one supposes that Goethe, let alone his publisher, should have been liable to the families of the young men who were moved by *The Sorrows of Young Werther* to commit suicide. That kind of vicarious liability would put quite a damper on the media's taste for public controversy, in rather clear violation of the free speech clause of the First Amendment. Cf. *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021–24 (5th Cir.1987); *Adams v. Frontier Broadcasting Co.*, 555 P.2d 556, 565–67 (Wyo.1976). Although the Charles Perez Show does not appeal to a fastidious taste, the program in question dealt in at least a quasi-serious fashion with a subject of great public interest in this era of challenge to the conventional family.

Analysis is complicated by the fact that the show was not broadcast live. Even if the Tribune Entertainment Company cannot be faulted for the stepmother's arguable infringement of her stepdaughter's privacy, this would not of itself justify its action in broadcasting the show weeks later, when it had ample opportunity to delete the offending segment. The broadcast could be compared to the republication of defamatory matter, which is not privileged. E.g., *Hucko v. Jos. Schlitz Brewing Co.*, 100 Wis.2d 372, 302 N.W.2d 68, 72 and n. 3 (App.1981); *Schiavone Construction Co. v. Time, Inc.*, 735 F.2d 94, 96–97 (3d Cir.1984); *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60–61 (2d Cir.1980) (Friendly, J.). (If it were, every broadcaster or newspaper publisher would be tempted to hang back from breaking a controversial story, hoping that by going second it would be buying immunity from suit.) But Tammy, the putative victim of the

alleged invasion of privacy, did not indicate that she wanted the segment deleted, or edited to remove the reference to her police record. By her silence, she forfeited any objection to the broadcast; for her silence would have led the broadcaster to believe, consistent with her manner during the program, that she thought she'd had the better of the exchange with her stepmother, having refuted her with the 360 degree turn and the rhetorical question.

Having consented to the broadcast of her side of the case, she could not insist on the editing out of the police report. That would have misled the television audience—and anyway she didn't ask that it be edited out. We do not criticize her for her failure to protest the impending broadcast. It is easy to understand that until her classmates saw the show and began teasing her in the inimitable style of adolescents she may not have apprehended the full consequences of what she had done. But she knew the contents of the segment and that it would be broadcast, and we conclude that the stepmother and derivatively the broadcaster were entitled to use private facts about the plaintiff to rebut her very public attack on the stepmother's own private character. So the suit was properly dismissed. In so ruling we do not mean to express approval of the practice of broadcasters of inviting teenagers to place themselves in embarrassing situations on television.

AFFIRMED.