In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-2765

DEPUY SYNTHES SALES, INC.,

*Plaintiff-Appellant,*

*v.*

ORTHOLA, INC. and BRUCE CAVARNO,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-01072-JMS-DLP — **Jane Magnus-Stinson**, *Chief Judge.*

_____

ARGUED JANUARY 14, 2020 — DECIDED MARCH 18, 2020

_____

Before WOOD, *Chief Judge*, and ROVNER and ST. EVE, *Circuit Judges*.

WOOD, *Chief Judge*. This lawsuit was sparked by a distributorship agreement that fell apart. DePuy Synthes Sales, Inc., manufactures medical implants and instruments, including joint-reconstruction products. It uses exclusive distributors to bring those products to its customers. For a time, its distributor for the Los Angeles area was OrthoLA, Inc., a company

founded and run by Bruce Cavarno. (We refer to them collectively as OrthoLA unless the context requires otherwise.)

We summarize the underlying dispute in more detail below. For now, it is enough to know that when the parties' distribution arrangements came to an end, OrthoLA turned to the Los Angeles Superior Court for help. DePuy responded with a motion to refer those claims to arbitration, but the state court denied it. DePuy then took two steps: it appealed the state court order to the California Court of Appeal, and on the same day it filed a demand for arbitration with the American Arbitration Association. Three days later, it filed the present suit in the federal district court in Indianapolis, seeking an order compelling arbitration and an injunction against the state-court proceedings. Citing *Colorado River Conservation Dist. v. United States*, 424 U.S. 800 (1976), the district court elected to stay the case before it pending the resolution of the California action. DePuy has appealed from that stay order. We conclude, however, that the district court did not stray beyond the boundaries of its discretion, and so we affirm.

**I**

The relationship between DePuy and OrthoLA began in 2008, when the parties signed a Sales Representative Agreement (the "Sales agreement"). It gave OrthoLA the exclusive rights in the Los Angeles area to distribute certain products; the parties renewed it several times. The November 2015 renewal again appointed OrthoLA as DePuy's "exclusive sales representative" in a territory that included several counties in Southern California. That agreement also contained an arbitration clause, committing the parties to resolve "[a]ny controversy or claim arising out of or relating to this Agreement" by arbitration conducted under the auspices of the American

Arbitration Association's commercial rules. It designated Indianapolis as the place of arbitration, and Indiana law as the substantive law to be applied, unless the question related to the arbitration provision, in which case the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, would apply.

As part of the 2015 renewal, the parties also signed a Continuing Income Agreement (the "Income agreement"). It committed DePuy to pay OrthoLA income for ten years after the termination or expiration of the Sales agreement, unless DePuy ended the Sales agreement pursuant to certain terms, such as if OrthoLA engaged in competitive or solicitation activities. The Income agreement contained an arbitration clause identical to the one in the Sales agreement.

In 2017, the Sales agreement was up for renewal. The parties attempted to negotiate a continuation, but they failed to do so, and so the agreement expired according to its terms on January 7, 2018. The very next day, January 8, all of OrthoLA's sales representatives left OrthoLA and moved over to Golden State Orthopedics, another one of DePuy's distributors. DePuy took the position that it did not owe OrthoLA any continuing payments under the Income agreement, because (it said) OrthoLA had violated the Sales agreement by competing with other distributors and soliciting their business. This, DePuy contended, amounted to a forfeiture on OrthoLA's part of any right to continuing income.

## II

It did not take long for this dispute to spill into the courts. In October 2018, OrthoLA filed suit in the Los Angeles Superior Court against Golden State, DePuy, two people associated with Golden State, and Does 1–50. It offered seven

theories of recovery, four in tort and three in contract. The tort counts asserted that Golden State had wrongfully induced OrthoLA's sales representatives to breach their contracts with OrthoLA, while the contract counts focused on DePuy's failure to make the payments contemplated by the Income agreement. OrthoLA's complaint sought a declaratory judgment that portions of both the Sales agreement and the Income agreement were unenforceable because they were against California public policy, as outlined in California Business & Professions Code section 16600.

On December 5, 2018, DePuy asked the California court to stay its proceedings and to issue an order compelling OrthoLA to arbitrate the claims in accordance with the agreements. The state court denied that motion in February 2019. It found that California law applied to the preliminary arbitrability issue; that the provisions choosing Indiana law and an arbitral forum were unconscionable; and that both agreements were substantively unconscionable because they were one-sided—only DePuy could file a lawsuit to enforce any part of the Income agreement and two provisions of the Sales agreement.

As one might expect, on March 15, 2019, DePuy appealed that ruling to the state appellate court. What happened next, in contrast, was less predictable. On the same day it filed its state appeal (which remains pending), DePuy filed a demand for arbitration with the American Arbitration Association (AAA). It sought arbitration in Indianapolis, pursuant to the terms of the agreements, and it named as respondents both Cavarno and OrthoLA. It presented two claims to the AAA: (1) one for a declaration that the actions DePuy and Golden State (and those associated with them) had taken were

consistent with the Sales agreement; and (2) one for damages based on Cavarno and OrthoLA's alleged violations of the two agreements, by improperly suing in California.

Three days later, on March 18, DePuy followed up on its arbitral demand with two petitions in the U.S. District Court for the Southern District of Indiana. The first asked the court to compel OrthoLA and Cavarno to arbitrate the disputes under the Income agreement and to enjoin them from proceeding with the California state-court action. The second was similar, but it referred to the Sales agreement.

After consolidating the two cases, the district court issued an order on September 11, 2019. But in that order, it refrained from ruling on the merits. Instead, the court announced that it was exercising its discretion to stay the petitions before it pursuant to *Colorado River*, pending the resolution of the California action. DePuy has taken an appeal from that decision; it argues that the court abused its discretion by deferring to the state courts.

### III

Before we address the merits of DePuy's appeal, we say a word about jurisdiction. The district court had jurisdiction under 28 U.S.C. § 1332(a), because DePuy is a Massachusetts corporation with its principal place of business in Massachusetts; OrthoLA is a California corporation with its principal place of business in California; and Cavarno is a citizen of California. (OrthoLA contended that Golden State had to be added to the case as a plaintiff pursuant to Federal Rule of Civil Procedure 19, but the district court rejected that argument, and no one has pursued it on appeal.) The amount in controversy easily exceeds $75,000—by one measure,

OrthoLA lost more than a million dollars it thought were coming to it under the Income agreement.

Our appellate jurisdiction is also secure. The Supreme Court faced exactly this situation in *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). There too the case began with a petition to compel arbitration; the district court decided to stay its proceedings pending the conclusion of a concurrent state-court suit; and the original petitioner appealed from the stay order. The Supreme Court concluded that "the stay order was final for purposes of appellate jurisdiction" pursuant to 28 U.S.C. § 1291. *Id.* at 9. The stay of the federal suit, it reasoned, "meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata." *Id.* at 10.

**IV**

The question we must answer is whether this is one of those rare cases in which the federal court may decline to exercise its jurisdiction in deference to a concurrent state-court proceeding. In other words, would deference to the state court promote "wise judicial administration," as the Supreme Court put it, *Colorado River*, 424 U.S. at 818, or would it be a failure to meet the court's normal obligation to hear and decide cases properly before it?

In order to answer that question, we start with a quick review of the *Colorado River* decision. Like our case, it involved parallel litigation in the state courts and the federal courts. The underlying dispute was, for all practical purposes, identical: it had to do with certain water rights that the United States held, both on its own account and on behalf of some Indian tribes. The state of Colorado had an elaborate

administrative structure through which the state was organized into seven divisions for purposes of allocating the state's scarce waters. Nonetheless, relying on 28 U.S.C. § 1345, which gives the federal district courts jurisdiction over any civil action that the United States brings as a plaintiff, the United States sued in federal court for a declaration of its rights to the waters in certain rivers in Division 7. Shortly after that suit began, some of the defendants filed an application in state court; relying on a special statute, they sought to include the United States as a defendant in broader state-court proceedings designed to adjudicate all rights in Division 7. After learning of the state-court suit, the district court decided that it had to abstain from deciding the case. The Tenth Circuit reversed, however, and the Supreme Court then granted certiorari to decide, among other things, whether the district court correctly dismissed the action.

After assuring itself that "the state court had jurisdiction over Indian water rights" under the relevant legislation, 424 U.S. at 809, the Supreme Court turned to the question whether "the District Court's dismissal was appropriate under the doctrine of abstention," *id.* at 813. It began by stressing that abstention is the exception, not the rule, when a federal court has jurisdiction over a case. It then rejected the possibility of abstaining under the rules announced in either *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941) (unsettled question of state law relevant to federal constitutional question), or *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) (important state public policy, elaborate system). It also dismissed the appropriateness of abstention under *Younger v. Harris*, 401 U.S. 37 (1971) (federalism-based non-interference with state criminal proceedings or similarly important government functions).

The fact that the traditional abstention doctrines did not apply was not, however, the Court's last word. Taking a broader view, it stated that

> there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.

*Id*. at 817 (cleaned up). The general principle among the federal district courts, it noted, "is to avoid duplicative litigation." *Id.* No such rule of thumb exists for parallel litigation in the state and federal courts, however, because of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* That said, the Court recognized a narrow set of circumstances in which a federal suit should yield to a parallel state suit. It gave a number of examples of such circumstances:

- The court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts;

- The inconvenience of the federal forum may counsel this type of abstention;

- The order in which jurisdiction was obtained by the concurrent fora is relevant.

To that list, we have added considerations such as the desirability of avoiding piecemeal litigation; the source of the

governing law; the relative progress of the proceedings in each court; the availability of removal; and whether the federal claim is vexatious or contrived. *LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1556, 1559 (7th Cir. 1989).

Demonstrating that it did not mean, by discouraging this type of administrative abstention, to preclude it altogether, the Court went on to conclude that several factors in the case before it "counsel[ed] against concurrent federal proceedings." 424 U.S. at 819. Federal legislation recognized that the state courts were competent to adjudicate the government's water rights, the case dealt with the disposition of a special type of property, and the state had an elaborate and unified system for this issue—one that was vitally important to its interests. Furthermore, very little had happened yet in the federal court. Taken together, these factors persuaded the Court that the district court properly dismissed the federal action.

In *Moses Cone*, in contrast, the Court adhered to the general rule discouraging *Colorado River* abstention in the face of parallel state-court litigation. But it again emphasized that

> the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.

460 U.S. at 16. Applying that approach, the Court held in *Moses Cone* that there was "no showing of the requisite exceptional circumstances to justify" a stay of the federal case. *Id.* at 19. There was no property involved, nor was convenience a factor. And the concerns about piecemeal litigation and the

order in which jurisdiction was obtained, the Court found, counseled against the stay. It was inevitable in *Moses Cone* that proceedings would go forward in two different tribunals, because the arbitration agreement covered only the Hospital and the construction company, yet there was a related dispute between the Hospital and the Architect that had to proceed in court. The timing of the litigation did not support a stay, either. The Hospital did not refuse to arbitrate until less than a day before it filed the state suit. The construction company had no reasonable opportunity to file its petition to compel arbitration in federal court before that time. Nothing of significance had happened in the state court before the federal court action began. Indeed, in terms of practical progress, more had happened in federal court by the time the *Colorado River* stay was sought.

In closing, the Court made two other observations that bear on our case. First, it expressly declined to decide "whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that *Colorado River* counsels in favor of deferring to a parallel state-court suit." *Id.* at 28. The two operate in much the same way. Second, it indicated that the district court's action is ultimately reviewed for abuse of discretion, when it said that "[i]f there is any substantial doubt [about the adequacy of the state-court proceeding], it would be a serious abuse of discretion to grant the stay or dismissal at all." *Id.*

We have found a two-step analysis to be a helpful way of approaching *Colorado River* cases. The first question is "whether the concurrent state and federal actions are actually parallel." *LaDuke*, 879 F.2d at 1559. If so, the second question is whether the necessary exceptional circumstances exist to

support a stay or dismissal. *Id.* A variety of factors can inform the second question, as *Colorado River* indicated. They include the following:

1. Whether the case concerns rights in property, and if so, whether the state has assumed jurisdiction over that property;

2. The inconvenience of the federal forum;

3. The desirability of consolidating litigation in one place (put otherwise, the value in avoiding "piecemeal" or broken-up proceedings);

4. The order in which jurisdiction was obtained in the concurrent fora;

5. The source of governing law—federal or state;

6. The adequacy of the state-court action to protect the federal plaintiff's rights;

7. The relative progress of the state and federal proceedings;

8. The presence or absence of concurrent jurisdiction;

9. The availability of removal; and

10. Whether the federal action is vexatious or contrived.

See *id.* Not all of these considerations will be pertinent to every case, nor does this list preclude the district court from taking into account a special characteristic of the case before it.

Looking first to the question whether the California litigation and the Indiana litigation were genuinely parallel, we find little to debate. Two suits are considered parallel "when substantially the same parties are contemporaneously

litigating substantially the same issues in another forum." *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004). Formal symmetry is unnecessary, as long as there is a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Id.* The two lawsuits in our case are parallel, by that or any other definition we can imagine. They involve the same parties, the same facts, and the same issues. *Tyrer v. City of S. Beloit, Ill.*, 456 F.3d 744, 752 (7th Cir. 2006). The question is whether the Income agreement requires OrthoLA to arbitrate the claims it asserted in the California lawsuit against DePuy. The same is true for the petition under the Sales agreement. The fate on the merits of any individual claim has nothing to do with the parties' obligation (or lack thereof) to submit it to arbitration. These are parallel actions, and so we turn to an evaluation of exceptional circumstances.

This case is not about property, and so Factor 1 can be ignored. The federal forum cannot be considered to be inconvenient for purposes of Factor 2 (though the district court thought differently), because the parties chose Indiana law and an Indiana venue in their agreement. Factor 3 is a different matter: the district court found that the risk of splintering this litigation across several places was great: functionally identical suits in two places creates a high risk of inconsistent results and wasteful duplication. This is what concerned us in *Tyrer*, where we noted that "the danger of piecemeal litigation does not turn on formal identity of issues but on concerns about the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority." 456 F.3d at 756. We too find that Factor 3 weighs strongly in favor of abstention.

Similarly, Factors 4 and 7 support abstention. As we know from *Moses Cone*, the literal order in which the two competing courts obtained jurisdiction is not dispositive. But to the extent it makes a difference, in our case the California courts by a long margin were first. More important is Factor 7—the relative progress of the litigation in each place. As we related earlier, the California litigation got underway in October 2018; the Los Angeles Superior Court rejected DePuy's motion to compel arbitration and to stay its own proceedings in February 2019; and DePuy took an appeal from that order to the California Court of Appeal in March 2019. Only then did it actually seek arbitration before the AAA, and it did not turn to the federal court until three days after it filed its state-court appeal. On the critical question of arbitrability, therefore, the state courts were well along the way to a resolution.

The governing law (Factor 5) on the topic of arbitration is primarily federal, though we note that California also has an arbitration act, Cal. Code Civ. Proc. § 1280 *et seq.* The parties here, however, specified that their agreement was to be governed by the Federal Arbitration Act (FAA), and we assume for present purposes that they were entitled to do so. This means that federal law governs the arbitrability issue. On the other hand, the question whether an enforceable agreement to arbitrate exists, applying normal contract rules, is normally governed by state law (either Indiana or California—we need not choose). See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts."). The district court thought that the latter point was strong enough to overpower

the applicability of the FAA. We do not go that far, but we do find that the applicable law is at best a neutral factor.

Looking at the adequacy of the state-court action to protect the federal plaintiff's rights (Factor 6) and the presence of concurrent jurisdiction (Factor 8), we see no error in the district court's conclusion that DePuy had nothing to fear from the state courts. The FAA "provides concurrent jurisdiction to states to enforce arbitration agreements," *Zurich Am. Ins. Co. v. Superior Court for State of Calif.*, 326 F.3d 816, 826 (7th Cir. 2003), indicating that Congress saw no need to carve out an exclusive federal preserve in this field. And, other than the fact that the Los Angeles court ruled adversely to DePuy, there is no reason to think that the state courts could not protect its rights. The state courts are co-equal partners with the federal courts when it comes to protecting federal rights. See *AXA Corp. Sols. v. Underwriters Reinsurance Corp.*, 347 F.3d 272, 280 (7th Cir. 2003). We do not know how the state appellate court will see this case. We also make no comment on the state trial court's ruling. It is enough that the California courts are open for business and that they (like all courts) are bound by the Supremacy Clause to give effect to federal laws. DePuy complains that the appeal may drag on for too much time, but it is DePuy that has risked extra time by loading up different court systems with parallel actions. These two factors support the district court's stay.

Factor 9, the possibility of removal, is more complex. When OrthoLA initially filed its state-court action against DePuy (a Massachusetts citizen both by incorporation and by principal place of business), it also named numerous California parties on the defense side—Golden State, two named people who worked for Golden State, and Does 1–50, whose

citizenship is unascertainable and does not affect removal. See *Howell by Goerdt v. Tribune Entertainment Co.*, 106 F.3d 215, 218 (7th Cir. 1997). John Does do not defeat diversity if they are merely nominal parties. *Id.* But in a case with in-state defendants, the risk of bias against an out-of-state party is also not likely to be significant. *Day v. Union Mines Inc.*, 862 F.2d 652, 660 (7th Cir. 1988). Add to this the fact that Golden State is at best a bystander in the dispute over arbitration, and we have a factor that gives at best a minor push toward the Indiana federal court.

Last is the question whether the federal case was brought for vexatious or contrived reasons (Factor 10). Although we are not willing to go quite that far, we do think that DePuy's decision to open a second front in its effort to obtain arbitration just three days after it filed its appeal in the California courts was at best opportunistic and at worst manipulative. DePuy protests that it was not seeking a second audience for its arguments about the arbitration clause, but neither the district court nor we are persuaded. Its argument would be more believable if it had not waited until after the Los Angeles Superior Court denied its motion to compel arbitration.

## V

As is all too often the case with unweighted multi-factor "tests," we have here several points that might indicate that the federal court abused its discretion by choosing not to proceed with the federal case, and a number of other points that support the court's decision to stay the federal action in favor of the California proceedings. We can infer, however, from *Moses Cone* that the relative progress of the case in one court or another is of greater importance than some of the other

considerations. *Moses Cone* also teaches that there is no reason to avoid the federal forum if parallel litigation is inevitable.

Here, the adjudication of DePuy's petition to enforce the arbitration clauses in the two agreements was complete in the trial court and was in the process of being handled by the state appellate court. And there was no need at all for parallel suits. The district court was rightly concerned about the strategy of staying in the state court until after it had ruled, and only then seeking a second bite at the apple in federal court. We are satisfied that the district court reasonably weighed these incommensurables, with proper attention to the general duty to hear cases, and that it did not abuse its discretion in finding the necessary exceptional circumstances to justify a *Colorado River* stay.

We therefore AFFIRM the judgment of the district court.